UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x
In re:

CESAR CEDILLO,

                    Debtor.
---------------------------------------------------------------------x
CARVER FEDERAL SAVINGS BANK,

                    Plaintiff,

     -against-

CESAR CEDILLO,

                    Defendant.
---------------------------------------------------------------------x

Chapter 7
Case No. 13-42445-ess

Adv. Pro. No. 15-01001-ess

## MEMORANDUM DECISION ON CARVER FEDERAL SAVINGS BANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*Appearances*:

Frank C. Dell'Amore, Esq.
Jaspan Schlesinger LLP
300 Garden City Plaza
Garden City, NY 11530

*Attorneys for Carver Federal Savings Bank*

Norma E. Ortiz, Esq.
Ortiz & Ortiz LLP
32-72 Steinway Street (Suite 402)
Astoria, NY 11103

*Attorneys for Cesar Cedillo*

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

Before the Court is the motion of Carver Federal Savings Bank ("Carver") for partial

summary judgment on three claims asserted in the Complaint dated January 1, 2015 (the

"Summary Judgment Motion"), on grounds that there is no genuine dispute as to a material fact

as to each element of these claims and that as a result, Carver is entitled to the entry of judgment

as a matter of law.  Carver moves for summary judgment on its claim that a debt owed to it by

Cesar Cedillo, the debtor in this Chapter 7 case, is nondischargeable pursuant to Bankruptcy

Code Section 523(a)(2)(B) because the debt arises from Mr. Cedillo's submission of a materially

false personal financial statement (the "PFS"), a writing concerning his ownership interests in

several corporations and which Carver relied on when it made several loans to corporations

controlled by him**.**

Alternatively, Carver moves for summary judgment on its claim against Mr. Cedillo

arising under Bankruptcy Code Section 727(a)(2), to deny Mr. Cedillo a discharge in his Chapter

7 bankruptcy case, on grounds that Mr. Cedillo transferred all of his right, title, and interest in

assets of a hardware store owned by him, within one year of the petition date, and with the intent

to hinder, delay, or defraud creditors of his estate, including Carver.  And Carver moves for

summary judgment on its claim against Mr. Cedillo arising under Bankruptcy Code

727(a)(4)(A), to deny Mr. Cedillo a discharge here, on grounds that Mr. Cedillo, knowingly and

fraudulently, in connection with his bankruptcy case, made false oaths and accounts.

Mr. Cedillo opposes Carver's Summary Judgment Motion on grounds, among others, that

he was forthcoming with respect to his financial condition in his PFS and in connection with this

bankruptcy case.  He also argues that any errors and omissions in his Schedules and Statements

were inadvertent and unintentional and do not provide a basis for the harsh remedy of denial of

his bankruptcy discharge.  And at a minimum, Mr. Cedillo argues, Carver has not shown that

there is no genuine dispute as to a material fact as to whether he acted with the intent to deceive

or defraud his creditors, or that he knowingly and fraudulently made a false statement in this

bankruptcy case.

### Jurisdiction

This Court has jurisdiction over this adversary proceeding pursuant to Judiciary Code

Sections 157(b)(1) and 1334(b), and the Standing Order of Reference dated August 28, 1986, as

amended by the Order dated December 5, 2012, of the United States District Court for the

Eastern District of New York.  In addition, this Court may adjudicate these claims to final

judgment to the extent that they are core proceedings pursuant to Judiciary Code Section 157(b),

and to the extent that they are not core proceedings, pursuant to Judiciary Code Section 157(c)

because the parties have stated their consent to this Court entering a final judgment.  *See*

*Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1940 (2015) (holding that in a non-core

proceeding, a bankruptcy court may enter final orders "with the consent of all the parties to the

proceeding.").

### Background

*Mr. Cedillo's Chapter 7 Bankruptcy Case*

*The Petition*

On April 24, 2013 (the "Petition Date"), Cesar Cedillo filed a voluntary petition for relief

under Chapter 7 of Title 11 of the United States Code.  That same day, Alan Nisselson was

appointed as the Chapter 7 Trustee.

*The Schedules and Statements*

On May 8, 2013, Mr. Cedillo, under the penalty of perjury, filed Schedules and Statements in connection with his bankruptcy case.[1]

Mr. Cedillo does not list any real property on his Schedule A – Real Property. He lists personal property totaling $13,853 on his Schedule B – Personal Property. Specifically, in response to Question 13, Mr. Cedillo lists a five percent ownership interest in "Katy & Tania" valued at $1.00, and in response to Question 18, he lists a 2012 tax refund valued at $4,000. In response to Question 21, "other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims," Mr. Cedillo lists two items of personal property. These are an action by him against Web Holdings, LLC ("Web Holdings") pending in the New York Supreme Court, Kings County, valued at $1.00; and a note from NY Electric Supplies LLC ("NY Electric") dated October 1, 2012, for $50,000, for the sale of inventory and fixtures from Kevin & Richard Hardware Corp. ("K&R Hardware"), also valued at $1.00. Case No. 13-42445, Schedule B, ECF No. 12, at 3. And Mr. Cedillo lists his interest in "machinery, fixtures, equipment, and supplies used in business" in the aggregate amount of $7,500. *Id.*

On August 6, 2013, Mr. Cedillo filed an amended Schedule B. His amended Schedule B omits descriptions of his personal property that were included in his initial Schedule B filed on May 8, 2013.

On his Schedule E – Creditors Holding Unsecured Priority Claims, Mr. Cedillo lists one creditor, the New York State Department of Taxation & Finance ("New York State"), as holding an unsecured priority claim in the aggregate amount of $150,000. On his Schedule F, he lists

---

[1] *See* Case No. 13-42445, ECF No. 12. Unless stated otherwise, all references to documents correspond to Adv. Pro. No. 15-01001.

several creditors holding unsecured, nonpriority claims, including a judgment in favor of Carver in the amount of $166,447.29, and an unsecured, nonpriority claim held by Web Holdings in an unknown amount.

Mr. Cedillo does not list any co-debtors on his Schedule H – Codebtors.  On his Schedule I – Current Income of Individual Debtor, he states that he was employed as a plumber for one week, but does not provide his exact dates of employment.  He also states that he received other monthly income in the amount of $600, and lists his combined average monthly income as $2,600.  He does not identify any contributors.  Mr. Cedillo lists expenses totaling $2,580 on his Schedule J – Current Expenditures of Individual Debtor, and these expenses include food, clothing, taxes, "payment to roommate for Rent, Utilities, Phone and Food," "Personal Care and Grooming," and "Vehicle Fuel and Maintenance."  Case No. 13-42445, Schedule J at 1-2.

Mr. Cedillo also filed a Statement of Financial Affairs.  In response to Question 18, he identifies four businesses in which he had an interest within six years preceding the Petition Date.  These are Kathy & Tania Inc. ("Kathy & Tania"), 654 Myrtle Ave. Corp. ("654 Myrtle"), 1111 Willoughby Ave. Realty Corp. ("1111 Willoughby"), and Troutman Realty Corp. ("Troutman").  In response to Question 10, Mr. Cedillo lists the transfer of a hardware store to NY Electric.  In response to Question 19, Mr. Cedillo identifies Humbert Suremott as having kept his books of accounts and records within the two years preceding his filing for bankruptcy.

On August 6, 2013, Mr. Cedillo filed an amended Statement of Financial Affairs.  He amended his response to Question 18, concerning businesses in which he had an interest within six years preceding the Petition Date, to include an interest in Kevin & Richard Plumbing & Heating Serv., and also updated the status or disposition of the suits and administrative proceedings in which he is or was a party within one year preceding the Petition Date to include

Carver's state court action against him.  Mr. Cedillo also updated his description of *Web Holdings, LLC v. Steal Corp., et al.*, Index No. 41979-2007, from "unknown," to "judgment."  Case No. 13-42445, Stmt. of Fin. Affairs at 2; Am. Stmt. of Fin. Affairs at 2.

*The Proofs of Claim*

The deadline for filing proofs of claim in Mr. Cedillo's bankruptcy case was June 20, 2014, and three creditors filed timely claims.  On July 19, 2013, Carver, the plaintiff in this action, filed a timely proof of claim in the unsecured amount of $408,030.66.  Carver alleges that its proof of claim arises from three separate deficiency judgments entered by the New York Supreme Court, Kings County, with respect to three separate defaults under three separate notes and mortgages on three separate pieces of real property each personally guaranteed by Mr. Cedillo.  Just over one month later, on August 21, 2013, Web Holdings filed a timely proof of claim in the secured amount of $506,665.21.  New York State's proof of claim followed, and on April 17, 2014, it filed a timely proof of claim in the amount of $63,762.32, $51,898.70 of which is a priority claim.

The last day to object to Mr. Cedillo's discharge was August 5, 2013.  From time to time, Mr. Cedillo and Carver, among others, agreed by stipulation to extend the time to object to Mr. Cedillo's discharge, and on November 12, 2014, the Court entered a Stipulation and Order, extending the time of Carver, among others, to object to Mr. Cedillo's discharge until January 16, 2015.

*The Rule 2004 Examination and Section 341 Meeting of Creditors*

On November 14, 2013, the Court entered an Order pursuant to Bankruptcy Rule 2004, directing Mr. Cedillo to produce documents and appear for an examination pertaining to his bankruptcy case.  Pursuant to that Order, on September 10, 2014, counsel for Carver and counsel

for Web Holdings examined Mr. Cedillo.[2]  And as described below, Carver alleges that Mr.

Cedillo's Rule 2004 Examination and Section 341 meeting of creditors (the "Section 341

Meeting") brought to light several inconsistencies in his bankruptcy filings.

*This Adversary Proceeding*

On January 2, 2015, Carver commenced this adversary proceeding against Mr. Cedillo by

filing a complaint.  Carver alleges that Mr. Cedillo obtained several loans from Carver by

submitting a knowingly false PFS, a writing concerning his ownership interests in several

corporations and which Carver relied on when it made the loans to corporations controlled by

Mr. Cedillo.

Carver also alleges that Mr. Cedillo transferred all of his right, title, and interest in assets

of the hardware store (the "Hardware Store Assets") that K&R Hardware operated (the

"Hardware Store") to NY Electric on October 1, 2012, within one year of the Petition Date of

April 24, 2013, and that he did so with the intent to hinder, delay, or defraud creditors of his

estate, including Carver.

In addition, Carver alleges that Mr. Cedillo failed to make several required disclosures on

his Schedules and Statements.  Specifically, Carver alleges that Mr. Cedillo did not disclose his

ownership interest in the Hardware Store.  And Carver alleges that Mr. Cedillo did not disclose a

security interest in the Hardware Store Assets, that was granted to him by NY Electric when it

acquired those assets from him.  And Carver alleges that Mr. Cedillo falsely stated the

indebtedness owed to him from NY Electric in exchange for the Hardware Store Assets.  Carver

further alleges that Mr. Cedillo did not disclose his ownership interest in 656 Myrtle Avenue

---

[2]  Web Holdings is also the plaintiff in an action entitled *Web Holdings, LLC v. Cesar Cedillo*, Adv. Proc. No. 15-01048, and on September 11, 2017, this Court entered a memorandum decision on Web Holdings, LLC's Motion for Partial Summary Judgment in that case.

Realty Corp. ("656 Myrtle Avenue").  Finally, Carver alleges that Mr. Cedillo did not identify income that he received separate from his full-time employment income.

*The Parties*

Carver, the plaintiff in this adversary proceeding, made several loans (the "Loans") to Mr. Cedillo.  On July 28, 2005, Mr. Cedillo, as president of Troutman, executed a consolidated and restated mortgage note in the original principal amount of $660,000 in favor of Carver (the "Troutman Note").  The Troutman Note was secured by a mortgage on the real property known as 46 Starr Street in Brooklyn (the "Troutman Mortgage").  Mr. Cedillo also personally guaranteed to Carver the amount due under the Troutman Note (the "Troutman Guarantee").

That same day, Mr. Cedillo, as president of 654 Myrtle, executed a consolidated and restated mortgage note in the original principal amount of $633,750 in favor of Carver (the "654 Myrtle Note").  The 654 Myrtle Note was secured by a mortgage on the real property known as 654 Myrtle Avenue in Brooklyn (the "654 Myrtle Mortgage").  Mr. Cedillo also personally guaranteed to Carver the amount due under the 654 Myrtle Note (the "654 Myrtle Guarantee").

Also on that same day, Mr. Cedillo, as president of 1111 Willoughby ("1111 Willoughby," together with Troutman and 654 Myrtle, the "Corporations") executed a consolidated and restated mortgage note in the original principal amount of $440,000 in favor of Carver (the "1111 Willoughby Note," and together with the Troutman Note and 654 Myrtle Note, the "Notes").  The 1111 Willoughby Note was secured by a mortgage on the real property known at 1111 Willoughby Avenue in Brooklyn (the "1111 Willoughby Mortgage," and together with the 654 Myrtle Mortgage and the Troutman Mortgage, the "Mortgages").  Here too, Mr. Cedillo personally guaranteed to Carver the amount due under the 1111 Willoughby Mortgage

(the "1111 Willoughby Guarantee," and together with the 654 Myrtle Guarantee and the Troutman Guarantee, the "Guarantees").

In March 2009, the Corporations defaulted under their respective notes and mortgages, and Mr. Cedillo defaulted under the Guarantees. As a result, Carver commenced three separate actions in New York Supreme Court, Kings County, to foreclose on the Mortgages while preserving its right to deficiency judgments against Mr. Cedillo pursuant to the Guarantees.

On October 24, 2011, the state court issued a deficiency judgment against Mr. Cedillo and in favor of Carver with respect to the 1111 Willoughby Guarantee, in the amount of $72,540. A little over a year later, on November 27, 2012, the state court issued a deficiency judgment against Mr. Cedillo and in favor of Carver with respect to the 654 Myrtle Guarantee, in the amount of $166,447.29. And on April 24, 2013, the state court issued a deficiency judgment against Mr. Cedillo and in favor of Carver with respect to the Troutman Guarantee, in the amount of $127,763.69 (together, the "Judgments"). Carver has filed a proof of claim in the amount of $408,030.66, which reflects the amounts owed by Mr. Cedillo to Carver under the Judgments, in Mr. Cedillo's bankruptcy case.

Mr. Cedillo, the defendant in this adversary proceeding, is the debtor in a Chapter 7 bankruptcy case filed in this Court on April 24, 2013.

*Mr. Cedillo's Alleged Misrepresentations in His Personal Financial Statement*

Carver alleges that on October 30, 1996, K&R Hardware was incorporated under New York law, and that Mr. Cedillo was its president and its sole legal and equitable owner. Carver alleges that K&R Hardware operated the Hardware Store located at 645 Myrtle Avenue in Brooklyn. And Carver alleges that some fourteen years later, on January 26, 2011, K&R Hardware was dissolved by proclamation of the New York Secretary of State. Carver alleges

that "[s]ubsequent to and as a result of the dissolution of K&R Hardware, the Hardware Store was operated by [Mr. Cedillo] as a sole proprietorship."  Compl. ¶ 23.

Carver alleges that on April 4, 2005, Mr. Cedillo submitted the PFS to Carver "with the intention of inducing Carver" to make the Loans secured by mortgages on the properties. Compl. ¶ 35.  Carver alleges that the PFS states that Mr. Cedillo is the "Owner (President)" of K&R Hardware and Kevin & Richard Plumbing & Heating Supplies Corp. ("K&R Plumbing"). Compl. ¶ 14.  In addition, Carver alleges that the PFS states that Mr. Cedillo is the 100 percent owner of Troutman, 654 Myrtle, and 1111 Willoughby.

Carver alleges that, contrary to the information provided on the PFS, Mr. Cedillo never owned K&R Plumbing.  In addition, Carver alleges that Mr. Cedillo is not, and never was, the 100 percent owner of the Corporations.

Mr. Cedillo responds that he signed and submitted the PFS to Carver after a "neighborhood mortgage broker called Rita" prepared the application on his behalf.  Opp., ECF No. 30, Ex. 1 (Declaration of Cesar Cedillo) ("Cedillo Decl.") ¶ 15.  Mr. Cedillo argues that he "did not believe, when [he] submitted the PFS, that [he] was the sole equitable owner of the four S.A.R.E. corporations listed in the PFS,"[3] but argues "since [he] was duly authorized to enter into mortgages on behalf of those corporations," "the PFS did not paint a substantially false picture of [his] finances.  Cedillo Decl. ¶ 18.

### Mr. Cedillo's Alleged Nondisclosures with Respect to the Hardware Store and the Hardware Store Transfer

Carver asserts that in 2012, NY Electric was incorporated under New York law, and that Rosa Vasquez, a/k/a Sylvia Vasquez, a/k/a Rosa Sylvia Vasquez is its sole managing member.

---

[3]  The corporations listed in the PFS are Kathy & Tania, Troutman, 654 Myrtle Avenue, and 1111 Willoughby.

Pl's Mem., ECF No. 25, at 3 (citing Summary Judgment Motion, ECF No. 23-14, (Deposition of Rosa Vasquez at 9-10)).  Carver also alleges that Mr. Cedillo and Ms. Vasquez have been married since 2013, and that prior to their marriage, they were live-in companions for thirty years.  Pl's Mem. at 3 (citing Summary Judgment Motion, Ex. 14 (Deposition of Rosa Vasquez at 8-9)).

Carver alleges that pursuant to a bill of sale executed on October 1, 2012, Mr. Cedillo transferred all of his right, title, and interest in and to the Hardware Store and its assets to NY Electric for the stated consideration of $50,000 (the "Hardware Store Transfer").  Carver alleges that the Hardware Store Assets included, among other things, trade fixtures, inventory, and equipment.

Carver also alleges that NY Electric, through Ms. Vasquez, executed a chattel mortgage stating that the $50,000 purchase price was payable to Mr. Cedillo, by NY Electric, in thirty-six consecutive monthly payments of $1,454.06, commencing on November 1, 2012, and continuing through October 1, 2015, with interest at an annual rate of three percent (the "Chattel Mortgage").  Carver alleges that pursuant to the Chattel Mortgage, and as security for NY Electric's payment, NY Electric granted Mr. Cedillo a security interest in the Hardware Store Assets.  Carver alleges that Mr. Cedillo did not disclose his ownership interest in the Hardware Store.  Carver also alleges that Mr. Cedillo failed to identify or disclose this security interest as an asset of his bankruptcy estate.

Additionally, Carver alleges that NY Electric has made no payments to Mr. Cedillo in connection with the Hardware Store Transfer.  And Carver alleges that Mr. Cedillo lists the amount owed to him by NY Electric as $1.00, not in excess of $50,000, on his Schedule B.

Mr. Cedillo responds that on October 1, 2012, he executed a bill of sale that transferred the Hardware Store Assets to NY Electric, and that the bill of sale provided that he, "individually and as sole shareholder of [K&R Hardware]," transferred the assets.  Compl. ¶ 22 (quoting Summary Judgment Motion, Ex. 16 (Bill of Sale)).  *See* Amended Answer ("Answer"), ECF No. 12, ¶ 22.  But Mr. Cedillo argues that he "caused K&R Hardware to transfer its assets to NY Electric," and that K&R Hardware, not he, transferred the Hardware Store Assets to NY Electric.  Def's Counterstmt.  ECF No. 31, ¶ 35.

Mr. Cedillo further responds that he inadvertently did not disclose his ownership interest in K&R Hardware in response to Question 18 of the Statement of Financial Affairs.  Mr. Cedillo also argues that he disclosed the Chattel Mortgage as an asset of his estate.  And Mr. Cedillo does not dispute that NY Electric has made no payments on account of the Hardware Store Transfer, and that he listed the amounts due and owing to him by NY Electric as $1.00, not in excess of $50,000, on his Schedule B.

### *Mr. Cedillo's Alleged Nondisclosures with Respect to 656 Myrtle Avenue Realty Corp.*

Carver alleges that Mr. Cedillo did not disclose "his ownership interest in other entities in which he maintained an interest in the six years preceding the Petition Date," including 656 Myrtle Avenue.  Compl. ¶ 61.  Carver argues that from 2006 until at least September 21, 2015, Mr. Cedillo was the president of 656 Myrtle Avenue, and that "there are no documents indicating that [Mr. Cedillo] ever ceased being the President of 656 Myrtle [Avenue]."  Pl's Mem. at 16.  And as a result, Carver argues that Mr. Cedillo "was required to disclose 656 Myrtle [Avenue] on his Petition."  Pl's Mem. at 16.

Mr. Cedillo responds that prior to the Petition Date, he was the president of 656 Myrtle Avenue, and that there are no documents indicating that he ceased being the president of the

corporation.  Similarly, Mr. Cedillo states that prior to the Petition Date, he was a shareholder of

656 Myrtle Avenue, and that there are no documents indicating that he ceased being a

shareholder of the corporation.  Mr. Cedillo states that "he did not list an interest in 656 Myrtle

[Avenue] when he submitted [the PFS] to Carver . . . in 2005."  Def's Counterstmt. ¶ 45.

*Mr. Cedillo's Alleged Nondisclosures with Respect to His Income*

Carver alleges that Mr. Cedillo did not disclose additional income that he received prior

to the Petition Date, including amounts received in 2011.

Mr. Cedillo responds that he "strongly disputes that he intentionally omitted the bank

deposits or income in an attempt to defraud his creditors . . . ."  Def's Mem., ECF No. 32, at 18.

*The Claims for Relief*

Carver asserts five claims for relief, and seeks summary judgment with respect to the

First, Second, and Fourth Claims only.

In its First Claim for Relief, asserted under Bankruptcy Code Section 523(a)(2)(B),

Carver claims that Mr. Cedillo executed a materially false PFS, which distorted his financial

condition, "on which [Carver,] to whom [Mr. Cedillo] is liable for such money . . . reasonably

relied,"  and that Mr. Cedillo "caused to be made or published the [PFS] with the intent to

deceive Carver."  Compl. ¶ 44.  And as a result, Carver seeks a judgment denying a discharge to

Mr. Cedillo, and moves for summary judgment on this claim.

In its Second Claim for Relief, asserted under Bankruptcy Code Section 727(a)(2),

Carver claims that within the year preceding the Petition Date, Mr. Cedillo "transferred,

removed, destroyed, mutilated, or concealed" assets, including the Hardware Store Assets and

his legal and equitable interests in K&R Plumbing, and did not receive any consideration in

return.  Compl. ¶¶ 49-50.  And as a result, Carver seeks a judgment denying a discharge to Mr. Cedillo, and moves for summary judgment on this claim.

In its Third Claim for Relief, asserted under Bankruptcy Code Section 727(a)(3), Carver claims that Mr. Cedillo has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve" information from which Mr. Cedillo's financial affairs and condition or business transactions might be ascertained.  Compl. ¶ 54.  And as a result, Carver seeks a judgment denying a discharge to Mr. Cedillo.

In its Fourth Claim for Relief, asserted under Bankruptcy Code Section 727(a)(4), Carver claims that Mr. Cedillo "knowingly and fraudulently" made a false oath or account in connection with his Chapter 7 bankruptcy case.  Compl. ¶ 58.  And as a result, Carver seeks a judgment denying a discharge to Mr. Cedillo, and moves for summary judgment on this claim.

In its Fifth Claim for Relief, asserted under Bankruptcy Code Section 727(a)(5), Carver claims that Mr. Cedillo has failed satisfactorily to explain "any loss of his assets or deficiency of assets to meet his liabilities."  Compl. ¶ 64.  And as a result, Carver seeks a judgment denying a discharge to Mr. Cedillo.

*This Summary Judgment Motion*

On June 27, 2016, Carver filed this Summary Judgment Motion, supported by a memorandum of law and a statement of undisputed material facts pursuant to Local Bankruptcy Rule 7056-1.  On September 3, 2016, Mr. Cedillo filed a declaration in opposition to Carver's Summary Judgment Motion (the "Opposition") and a counterstatement of undisputed material facts and objections to evidence pursuant to Local Bankruptcy Rule 7056-1.  And on September 6, 2016, Mr. Cedillo filed a memorandum of law in opposition to Carver's Summary Judgment

Motion.  On September 20, 2016, Carver filed a declaration in response to the Opposition and a reply memorandum of law in further support of its motion.

The Court held conferences on the Summary Judgment Motion from time to time, at which Carver and Mr. Cedillo, each by counsel, appeared and were heard.  The Court heard argument from counsel and closed the record at the November 21, 2016 hearing.  Over this same period, and for some time thereafter, the parties engaged in settlement negotiations, both independently and with the assistance of the Court.  The settlement negotiations were unsuccessful, and on August 29, 2017, the Court reserved decision.

## The Applicable Legal Standards

### *The Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c), made applicable to this adversary proceeding by Bankruptcy Rule 7056, provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact, and all of the inferences to be drawn from the underlying facts must be viewed by the court in the light most favorable to the party opposing the motion.  *See Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (holding that the court's role is "to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments").

Accordingly, the moving party must demonstrate that there is no genuine dispute as to a material fact as to each element of its claim.  If it does not, then summary judgment will be denied.  *See Smith v. Goord*, 2008 WL 902184, at *4, *aff'd*, 375 F. App'x 73 (2d Cir. 2010) (N.D.N.Y. Mar. 31, 2008) (citing *Anderson*, 477 U.S. at 250 n.4) (holding that summary judgment should be denied where the moving party does not show that there is no genuine dispute as to a material fact with respect to each essential element of the claim)).

Once the moving party satisfies its initial burden, "the burden then shifts to the nonmoving party to come forward with evidence sufficient to create a genuine dispute as to a material fact for trial."  *Silverman v. United Talmudic Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*, 446 B.R. 32, 49 (Bankr. E.D.N.Y. 2011).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  *See Anderson*, 477 U.S. at 249-50 (internal citations omitted) (observing that "if the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted")

"Statements in the pleadings alone are not sufficient to meet this burden."  *In re Allou Distribs., Inc.*, 446 B.R. at 49.  Rather, "[e]stablishing such facts requires going beyond the allegations of the pleadings as the moment has arrived to 'put up or shut up.'"  *In re Eugenia VI Venture Holdings, Ltd. Litig.*, 649 F. Supp. 2d 105, 117 (S.D.N.Y. 2008) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), *aff'd*, 370 F. App'x 197 (2d Cir. 2010), *cert. denied*, 540 U.S. 811 (2003)).  "Unsupported allegations in the pleadings thus cannot create a material issue of fact."  *In re Eugenia VI Venture Holdings*, 649 F. Supp. 2d at 117.  As the

Supreme Court has observed, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' [and] designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A party "must 'set forth' by affidavit or other evidence 'specific facts' to survive a motion for summary judgment . . . and must ultimately support any contested facts with evidence adduced at trial . . . ." *Bennet v. Spear*, 520 U.S. 154, 168 (1997). As one court observed, "[t]he non-moving party may not establish that there is a genuine issue to be resolved at trial through mere allegations or denials of the adverse party's pleadings, but rather must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law." *Beare v. Millington*, 2014 WL 1236750, at *3 (E.D.N.Y. Mar. 25, 2014), *aff'd*, 613 F. App'x 56 (2d Cir. 2015).

Claims that sound in fraud raise additional considerations. "Although summary judgment may be warranted in certain circumstances even when examining state of mind, courts must be cautions in such cases, and, as a result . . . disputes regarding intent are generally decided after a trial/evidentiary hearing resolving such factual issues." *Adler v. Ng (In re Adler)*, 395 B.R. 827, 843 (Bankr. E.D.N.Y. 2015).

Other courts are in accord. In *Redden v. Redden (In re Redden)*, the court held that "the issue of [a] [d]ebtor's intent in making the representations and taking the actions alleged in the complaint is a material issue which is not subject to adjudication by summary judgment." *Redden v. Redden (In re Redden)*, 234 B.R. 49, 51 (Bankr. D. Del. 1999). And in *Harris v. Dunn*, the court found that "summary judgment based on the determination of subjective factors such as intent . . . is seldom appropriate as such determinations require credibility evaluations and the weighing of evidence." *Harris v. Dunn*, 48 So. 3d 367, 373 (La. Ct. App. 2010). As the

court stated, "[the] circumstantial evidence that is usually necessary to prove intent requires the trier of fact to choose from competing inferences, a task that is not appropriate in a summary judgment proceeding." *Harris*, 48 So. 3d at 373. At the same time, "[w]hile the issue of fraudulent intent ordinarily cannot be resolved on summary judgment, it is also well-recognized that the summary judgment rule would be rendered sterile if the mere incantation of intent would operate as a talisman to defeat an otherwise valid motion." *In re Allou Distribs.*, 446 B.R. at 50 (citations and internal quotation marks omitted).

And finally, the denial of summary judgment in the face of a genuine dispute as to a material fact does not amount to an endorsement of the movant's position. *In re Allou Distribs.*, 446 B.R. at 50 (citing *Huff v. UARCO, Inc.*, 122 F.3d 374, 385-86 (7th Cir. 1997)). Rather, denial of summary judgment means only that the case should be heard by the trier of fact, and cannot be resolved as a matter of law.

### *Nondischargeability Under Bankruptcy Code Section 523(a)(2)(B)*

By its First Claim, Carver alleges that the debt owed by Mr. Cedillo is nondischargeable under Bankruptcy Code Section 523(a)(2)(B) because his PFS contained materially false information with respect to his financial condition, Mr. Cedillo submitted it with the intent to deceive Carver in connection with its determination whether to make the Loans, and Carver reasonably relied on the PFS when it extended the Loans to Troutman, 654 Myrtle, and 1111 Willoughby. In this motion, Carver seeks a judgment determining that the debt is nondischargeable.

"Exceptions to discharge under [Section] 523 must be . . . construed so as to give maximum effect to the Code's policy of providing honest but unfortunate debtors with a 'fresh start.'" *Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 624 (Bankr. N.D.N.Y.

2010) (quoting *Contini v. Cook (In re Cook)*, 2009 WL 2872864, at *3-4 (Bankr. N.D.N.Y. Apr. 7, 2009)).  Accordingly, exceptions from discharge are to be strictly construed against the movant and liberally in favor of the debtor.  *See Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 853 (8th Cir. 1997), *aff'd*, 523 U.S. 57 (1998).

Bankruptcy Code Section 523(a)(2)(B) excepts from discharge a debt for an extension of money or credit to the extent that it was obtained by "use of a statement in writing that is . . . materially false [with respect to] the debtor's . . . financial condition on which the creditor . . . reasonably relied and that the debtor . . . made with intent to deceive."  11 U.S.C. § 523(a)(2)(B).  As explained by the Second Circuit, "[i]n order to be awarded an exception from discharge under section 523(a)(2), a creditor must prove each statutorily enumerated element of fraud by a preponderance of the evidence."  *Bethpage Fed. Credit Union v. Furio (In re Furio)*, 77 F.3d 622, 624-25 (2d Cir. 1996).

The elements of a nondischargeability claim under Bankruptcy Code Section 523(a)(2)(B) are that  "for money, property, services, or an extension, renewal, or refinancing of credit," the debtor executed a statement in writing "(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with the intent to deceive."  11 U.S.C. § 523(a)(2)(B).

One element of Section 523(a)(2)(B) is that the plaintiff must "establish that Debtors obtained the extension of credit by the use of a writing."  *Hudson Valley Water Res., Inc. v. Boice (In re Boice)*, 149 B.R. 40, 45 (Bankr. S.D.N.Y. 1992).  The "Plaintiff need not prove that the writing constituting the false statement was entirely completed by Debtors.  It is sufficient that Debtors either wrote, signed, or adopted such statement to find that the documents were

'written' by them." *In re Boice*, 149 B.R. at 45.  As one court observed, the plaintiff "need not establish that the document constituting the false statement was entirely written or prepared by the Debtors.  It is sufficient, as a matter of law, that the Debtors either wrote, signed or adopted such statement to conclude that the document was 'written' by them." *First Fed. Savings & Loan Assoc. v. Kelley (In re Kelley)*, 163 B.R. 27, 35 (Bankr. E.D.N.Y. 1993).

A second key element of Section 523(a)(2)(B) is that the statement must be materially false.  A statement is materially false if it "'paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.'"  *In re Boice*, 149 B.R. at 45 (quoting *John Deere Co. v. Iverson (In re Iverson)*, 66 B.R. 219, 224 (Bankr. D. Utah 1986)).  "[M]isrepresentation concerning the ownership of assets is a material falsity pursuant to Code § 523(a)(2)(B)(i)." *In re Boice*, 149 B.R. at 45.  That is, "[t]he misrepresentation of ownership of assets and the failure to divulge the true ownership interests in the listed property is a 'material falsity' for purposes of Section 523(a)(2)(B)."  *Voyatzoglou v. Hambley (In re Hambley)*, 329 B.R. 382, 399 (Bankr. E.D.N.Y. 2005).  In other words, Section 523(a)(2)(B) requires more than a "merely erroneous or untrue statement."  *In re Boice*, 149 B.R. at 45.

A third element of Section 523(a)(2)(B) is that the statement must concern the debtor's financial condition.  As the Second Circuit has stated, "[i]n determining whether a statement relates to a debtor's financial condition, courts agree the term is not limited to formal financial statements."  *Spencer v. Bogdanovich* (*In re Bogdanovich*), 292 F.3d 104, 112 (2d Cir. 2002).  And as one bankruptcy court observed, "[a] statement concerning the ownership of assets clearly qualifies as a statement regarding financial condition."  *In re Hambley*, 329 B.R. at 399.

Other courts are in accord.  For example, the Fourth Circuit has stated that Bankruptcy Code Section 523(a)(2)(B) refers to a much broader class of statements than formal financial statements, which are "those 'respecting the debtor's . . . financial condition.'"  *Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060, 1061 (4th Cir. 2016).  And as one bankruptcy court noted, Bankruptcy Code Section 523(a)(2)(B) "does not require that the 'statement' be a traditional financial statement."  *Norcross v. Ransford (In re Ransford)*, 202 B.R. 1, 4 (Bankr. D. Mass. 1996).

A fourth element of Section 523(a)(2)(B) is that the party objecting to dischargeability must establish that it relied on the false statements submitted by the debtor and that its reliance was reasonable.  "An objective standard by which to measure 'reasonableness' requires that representations must be found to be of such a character that a reasonably prudent person would rely on them."  *Waterbury Community Fed. Credit Union v. Magnusson (In re Magnusson)*, 14 B.R. 662, 668 n.1 (Bankr. N.D.N.Y. 1981).  "Such a standard fosters a responsible and careful use of solicited financial statements and discourages the 'spurious use' of such statements which are obtained primarily with a view to the exception to discharge if the debtor defaults and declares bankruptcy."  *Id.*

And finally, a fifth and key element of Section 523(a)(2)(B) is the debtor's intent.  "Proving the element of deceptive intent under [Bankruptcy] Code § 523(a)(2)(B)(iv) is often difficult, as one will rarely admit to such intent."  *In re Boice*, 149 B.R. at 47.  As such, "it is virtually impossible to obtain direct proof of one's intent to deceive."  *Mun. Credit Union v. Brown (In re Brown)*, 55 B.R. 999, 1004 (Bankr. E.D.N.Y. 1986).

Courts therefore recognize that "[i]ntent to deceive may be inferred when the totality of the circumstances depicts deceptive conduct by the debtor."  *In re Boice*, 149 B.R. at 47.  "To

this end, Plaintiff must prove that Debtors made the statement knowing either that it was false, or that it was made with such reckless disregard of the truth so as to be the 'equivalent of intent to defraud.'" *In re Boice*, 149 B.R. at 47 (quoting *Town North Nat'l Bank v. Biedenharn (In re Biedenharn)*, 30 B.R. 342, 345 (Bankr. W.D. La. 1983)).

Bankruptcy courts have long recognized that a "failure to read the document, in and of itself, constitutes a reckless disregard for its accuracy." *First Fed. Savings & Loan Assoc. v. Kelley (In re Kelley)*, 163 B.R. 27, 36 (Bankr. E.D.N.Y. 1993). *See Long Island Trust Co. v. Rene Rodriguez (In re Rodriguez)*, 29 B.R. 537, 541 (Bankr. E.D.N.Y. 1983) (holding that if a debtor does "not read a statement prepared for him by another party that would, in and of itself, constitute reckless disregard equivalent to intent").

New York law is consistent with this rule. As one court noted, "[u]nder New York law, a person who signs an agreement is conclusively bound by it even if he did not read the agreement or understand its terms." *Kearins v. Panalpina*, 2013 WL 4647614 (E.D.N.Y. Aug. 28, 2013), *aff'd*, 570 F. App'x 9 (2d Cir. 2014).

Courts also consider a debtor's education when determining whether a debtor acted with reckless disregard for the consequences of its actions. For example, in one dischargeability action, the court noted that "[t]he debtor is a well-educated man with no physical or mental impairment," and concluded that where the debtor failed to read the written statement that he signed, "he acted with such reckless disregard that [the court] must find that he acted fraudulently." *In re Teachers Serv. Org. v. Anderson (In re Anderson)*, 10 B.R. 607, 608 (Bankr. S.D. Fla. 1981). And in another, the court considered the debtor's education to be a factor in determining whether the debtor acted with recklessness that amounted to the intent to deceive under Bankruptcy Code Section 523(a)(2)(B), and concluded that because the debtor "was an

educated and experienced businessman who had been involved in many previous transactions involving loans that were to be secured by deeds of trust on real estate," the debtor's "signing the Affidavits without reading them or making any inquiry exhibited a gross indifference to whether the Affidavits were truthful which is sufficiently egregious to satisfy the intent to deceive element required under section 523(a)(2)(B)." *Lawyers Title Ins. Co. v. Chesson (In re Chesson)*, 2012 WL 4794148, at *8 (Bankr. M.D.N.C. Oct. 9, 2012). And in another, the court found that where the debtor, a physician, reviewed a completed statement prepared by a lender, "was aware of its exact content, and signed it," despite the fact that it contained incorrect information, the fact that it was not prepared by him "was an insufficient basis for absolving him from responsibility. His reckless disregard is the equivalent of intent." *In re Rodriguez*, 29 B.R. at 538, 541.

And finally, "There is a substantial unanimity of view that intent to deceive is an issue of fact." *Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 302 (2d Cir. 1996). *See H.K. Deposit & Guaranty Co. Ltd. v. Shaheen (In re Shaheen)*, 111 B.R. 48, 52 (S.D.N.Y. 1994) (quoting *Citizens Nat'l Bank v. Vandergrift (In re Vandergift)*, 35 B.R. 76, 78 (Bankr. D. Md. 1983)) (holding that "'[q]uestions concerning intent and reliance are questions of fact, and, thus, the bankruptcy court's findings on these issues are subject to appellate review under the clearly erroneous standard'").

*Denial of Discharge Under Bankruptcy Code Section 727(a)(2)(A)*

By its Second Claim, Carver alleges that Mr. Cedillo is not entitled to a discharge under Bankruptcy Code Section 727(a)(2) because he transferred all of his right, title, and interest in the Hardware Store Assets to NY Electric on October 1, 2012, within one year of the Petition Date of April 24, 2013, and did so with intent to hinder, delay, or defraud creditors of his estate.

In the Summary Judgment Motion, Carver seeks a judgment denying Mr. Cedillo a discharge under this section.

As the Second Circuit has held, Bankruptcy Code Section 727 "imposes an extreme penalty for wrongdoing," and as such, "it must be constructed strictly against those who object to the debtor's discharge and 'liberally in favor of the bankrupt.'" *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) (quoting *Bank of Pa. v. Adlman (In re Adlman)*, 541 F.2d 999, 1003 (2d Cir. 1976)). This is consistent with "the well-accepted principle that the Bankruptcy Act was intended to permit the honest debtor to get a new start in life free from debt." *In re Adlman*, 541 F.2d at 1003. *See Agai v. Mihalatos (In re Mihalatos)*, 527 B.R. 55, 65 (Bankr. E.D.N.Y. 2015) (stating that "[i]t is well-settled that the denial of a debtor's discharge is a drastic remedy . . . .").

As explained by the Second Circuit, "[t]o prove a § 727(a)(2) violation, a creditor must show 'an act (i.e. a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor),' and 'the party seeking to bar discharge must prove that *both* of these components were present during the one year period before bankruptcy.'" *Republic Credit Corp. I (In re Boyer)*, 328 F. App'x 711, 715 (2d Cir. 2009) (quoting *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993)).

In other words:

> [t]o prevail under section 727(a)(2)(A) of the [Bankruptcy] Code, a plaintiff must show, by a preponderance of the evidence, that: (1) the debtor transferred property; (2) said property belongs to the debtor; (3) the transfer occurred with actual intent to hinder, delay, or defraud; and (4) the transfer occurred within one year prior to the filing for bankruptcy.

*Najjar v. Kablaoui (In re Kablaoui)*, 196 B.R. 705, 708 (Bankr. S.D.N.Y. 1996). "Discharge will be precluded under § 727(a)(2) if all of the above prongs have been proven by a

preponderance of the evidence." *Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 663 (Bankr. S.D.N.Y. 2008).

A key component of Section 727(a)(2)(A) is that the property at issue was property of the debtor, so that the transfer diminished the debtor's bankruptcy estate. "Property of the debtor" is defined by Bankruptcy Code Section 541(a), and that definition is broad indeed. State law also informs this definition, and as the Supreme Court has noted, "[i]n the absence of any controlling federal law, 'property' and 'interest[s] in property' are creatures of state law." *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992). *See Kaufman v. Chalk & Vermilion Fine Arts, LLC*, 31 F. App'x 206, 208 (2d Cir. 2002) (noting that "[b]ecause the Bankruptcy Code does not define 'interests in property,' state law controls").

But the definition of property of the estate is not without bounds, and the language of Section 541(a) is "sufficiently circumscriptive" to exclude "property in which the debtor has a derivative interest." *Mcorp Mgmt. Sols., Inc. v. Thurman (In re Thurman)*, 901 F.2d 839, 841 (10th Cir. 1990). That is, and as one court has stated, "Congress intended to limit the reach of § 727(a)(2)(A) only to those transfers of property in which the debtor has a direct proprietary interest." *In re Thurman*, 901 F.2d at 841.

A second key component of Section 727(a)(2)(A) is the debtor's intent. "In considering the issue of a debtor's transfer or concealment of assets with intent to hinder, delay or defraud a creditor, as described in § 727(a)(2)(A), the plaintiff must establish an actual intent to hinder, defraud or delay . . . ." *Glaser v. Glaser (In re Glaser)*, 49 B.R. 1015, 1019 (Bankr. S.D.N.Y. 1985). In other words, "constructive fraudulent intent cannot be the basis for denial of discharge" for purposes of Section 727(a)(2)(A). *In re Glaser*, 49 B.R. at 1019. *See Tese-Milner v. Gordon (In re Gordon)*, 2015 WL 269800, at *16 (Bankr. S.D.N.Y. Jan. 13, 2015) (holding

that "[t]he statute requires actual intent to hinder, delay, or defraud creditors or the trustee. Constructive intent to defraud does not suffice.").

Direct proof of actual intent to defraud is not the norm. Courts recognize that "fraudulent intent may be established by circumstantial evidence or by inferences drawn from a course of conduct, because rarely does a debtor admit that he actually intended to defraud creditors." *In re Glaser*, 49 B.R. at 1019. The question of a debtor's fraudulent intent is a question of fact in a Section 727 claim, and the court often looks to "the debtor's course of conduct and the surrounding circumstances," in formulating its answer. *In re Gordon*, 2015 WL 269800, at *16.

Courts in this Circuit recognize that "'[b]adges of fraud' have frequently been used as circumstantial evidence to ascertain whether a debtor had fraudulent intent in making transfers alleged to hinder, delay or defraud creditors." *In re Gordon*, 2015 WL 269800, at *16. These badges of fraud include:

(1)    the lack or inadequacy of consideration [for the transfer];

(2)    the family, friendship, or close associate relationship between the parties [to the transfer];

(3)    the retention [by the transferor] of possession, benefit, or use of the property in question;

(4)    the financial condition [of the transferor] both before and after the transaction in question;

(5)    the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6)    the general chronology of the events and transactions under inquiry.

*Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983).

*Denial of Discharge Under Bankruptcy Code Section 727(a)(4)(A)*

By its Fourth Claim, Carver alleges that Mr. Cedillo is not entitled to a discharge under Bankruptcy Code 727(a)(4)(A) because he knowingly and fraudulently, in connection with his bankruptcy case, made false oaths and accounts. Specifically, Carver alleges that Mr. Cedillo made fraudulent and material misrepresentations or omissions in his Schedules and Statements, and that his testimony during the Rule 2004 Meeting and the Section 341 Meeting sheds light on the inconsistencies in his bankruptcy filings. In the Summary Judgment Motion, Carver seeks a judgment denying Mr. Cedillo a discharge under this section as well.

"[A] discharge under [Bankruptcy Code Section] 727 is a privilege, not a right, and may only be granted to the honest debtor." *In re Mihalatos*, 527 B.R. at 65. This privilege comes with "the requirement that debtors act in good faith and provide full and honest disclosure." *Beer Sheva Realty Corp v. Pongvitayapanu (In re Pongvitayapanu)*, 487 B.R. 130, 138 (Bankr. E.D.N.Y. 2013). For example, "a debtor is required to sign the [bankruptcy] petition under the penalty of perjury . . . [and] [t]hat oath 'must be regarded as serious business.'" *In re Pongvitayapanu*, 487 B.R. at 138 (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir. 2013)). *See Siegel v. Weldon (In re Weldon)*, 184 B.R. 710, 715 (Bankr. D.S.C. 1995) (stating that "[t]he bankruptcy schedules and statements of affairs are carefully designed to elicit certain information necessary to the proper administration and adjudication of the case"). That is, "'[f]ull and honest disclosure' is required as it 'is crucial to the effective functioning of the bankruptcy system. Because the bankruptcy court, trustees, and creditors rely on the information disclosed by a debtor, the importance of full disclosure cannot be overemphasized.'" *In re Pongvitayapanu*, 487 B.R. at 138 (quoting *In re Loewry*, 398 B.R. 512, 515 (Bankr. E.D.N.Y. 2008)).

A creditor objecting to the discharge of the debtor must prove by a preponderance of evidence that "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 228 (Bankr. E.D.N.Y. 2000) (quoting *Dubrowsky v. Estate of Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 572 (E.D.N.Y. 2000)).  If these elements are established, then the debtor's discharge will be denied.

As with the element of intent under Bankruptcy Code Section 727(a)(2)(A), "[f]raudulent intent must be shown by actual, not constructive fraud." *In re Dubrowsky*, 244 B.R. at 571. Specifically, "[t]he party objecting to the discharge must show that the information was omitted for the specific purpose of perpetrating a fraud and not simply because the debtor was careless or failed to fully understand his attorney's instructions." *In re Dubrowsky*, 244 B.R. at 571-72.

Additionally, the party objecting to discharge under Section 727(a)(4)(A) must prove that the debtor made the intentionally false statement "'with respect to a material matter, that is one bearing a relationship to the debtor's business transactions or estate or which would lead to the discovery of assets, business dealings or existence or disposition of property.'" *In re Murray*, 249 B.R. at 228 (quoting *Walters v. Sawyer (In re Sawyer)*, 130 B.R. 384, 394 (Bankr. E.D.N.Y. 1991)).  *See St. Clair v. Cadles of Grassy Meadows II, LLC*, 550 B.R. 655, 674 (E.D.N.Y. 2016) (holding that "'[a]n item is material if it is related to the debtor's 'business transactions or estate which would lead to the discovery of assets, business dealings, or existence or disposition of property'" (quoting *In re Murray*, 249 B.R. at 228)); *Gardner v. Gardner (In re Gardner)*, 384 B.R. 654, 667 (Bankr. S.D.N.Y. 2008) (stating that omissions are material if they interfere "with the Trustee's ability to discover assets for the estate").

Notably, Bankruptcy Code Section 727(a)(4)(A) "'does not contain an explicit materiality requirement. Rather, the requirement was created by courts to ensure that debtors are not denied discharge for inconsequential or technical omissions.'" *Cadles of Grassy Meadows II, LLC*, 550 B.R. at 674. At the same time, "a debtor may . . . make a misstatement and prove that the misstatement caused minimal harm to the estate. But "'the determination of relevance and importance of the question is not for the debtor to make.'" *HSBC Bank USA v. Handel (In re Handel)*, 266 B.R. 585, 590 (Bankr. S.D.N.Y. 2001) (quoting *Guardian Indus. Prods., Inc. v. Diodati (In re Diodati)*, 9 B.R. 804, 808 (Bankr. D. Mass. 1981)).

### Discussion

*Whether Carver Has Shown that It Is Entitled to Summary Judgment on its First Claim for Relief – Nondischargeability Under Bankruptcy Code Section 523(a)(2)(B)*

Carver seeks the entry of an order granting partial summary judgment in its favor declaring Mr. Cedillo's debt nondischargeable under Bankruptcy Code Section 523(a)(2)(B), on grounds, among others, that Mr. Cedillo knowingly submitted a materially false PFS concerning his ownership interests in the Corporations, and Carver reasonably relied on it when it made the Loans to those entities.

Mr. Cedillo responds that summary judgment is not warranted. He states that at the time he submitted his PFS to Carver, he believed that he was the sole owner of the Corporations and that the PFS accurately described his financial condition. At a minimum, Mr. Cedillo argues that there are genuine disputes as to material facts as to whether the PFS contains materially false information and whether he intended to deceive Carver into making the Loans to the Corporations when he submitted the PFS.

The record shows that the parties agree as to certain material facts that concern this claim, and disagree as to others, as follows.

### The Personal Financial Statement

Carver and Mr. Cedillo agree that "[i]n early 2005, Cesar Cedillo . . . applied for several loans from Carver" on behalf of Troutman, 654 Myrtle, and 1111 Willoughby, and that these Corporations were controlled by him.  Def's Counterstmt. ¶ 1.  They also agree that on October 4, 2005, Mr. Cedillo signed and submitted a PFS to Carver, and that the PFS "expressly acknowledged that he was submitting [it] for the purpose of procuring, establishing and maintaining credit . . . with Carver."  Def's Counterstmt. ¶¶ 16-17.  And they agree that the PFS listed Mr. Cedillo as the sole shareholder of the Corporations.  Def's Counterstmt. ¶ 19.

However, Carver and Mr. Cedillo disagree with respect to a significant material fact, which is whether the PFS is materially false.

### The Question of Intent

Carver and Mr. Cedillo disagree with respect to a key element of Carver's Section 523(a)(2)(B) claim, which is whether Mr. Cedillo submitted the PFS with an intent to deceive Carver.

The elements of a nondischargeability claim under Bankruptcy Code Section 523(a)(2)(B) are that "for money, property, services, or an extension, renewal, or refinancing of credit," the debtor executed a statement in writing "(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with the intent to deceive."  11 U.S.C. § 523(a)(2)(B).  The Court considers each of these elements in turn.

*Whether Carver Has Established that Mr. Cedillo Executed a Statement in Writing*

The first element that Carver must establish is that Mr. Cedillo executed a statement in writing in connection with the debt at issue – here, the loans made by Carver to the Corporations, and Mr. Cedillo's guarantees of those obligations.  That is, Carver must show that there is no genuine dispute as to a material fact that Mr. Cedillo executed and submitted to Carver a statement in writing – here, the PFS.

Carver argues, and the record shows, that on April 4, 2005, Mr. Cedillo submitted a PFS bearing his signature to Carver.  Carver also argues that the "PFS is unquestionably a written statement and [Mr. Cedillo] has expressly acknowledged that he signed it."  Pl's Mem. at 7.  And Carver argues that "[w]hen signing the PFS, [Mr. Cedillo] expressly acknowledged that he was submitting the PFS 'for the purpose of procuring, establishing and maintaining credit . . . with [Carver].'"  Pl's Stmt. ¶ 17 (quoting Summary Judgment Motion, Ex. 1 (PFS)).

In response, Mr. Cedillo "concedes . . . [that] the PFS was a statement in writing concerning his financial condition and [Carver] reasonably relied upon it."  Opp. at 11.  He also does not dispute that on April 4, 2005, he submitted the PFS to Carver.  Answer ¶ 13.  And he does not dispute that when signing the PFS, he "expressly acknowledge[d] that he was submitting the PFS 'for the purpose of procuring, establishing and maintaining credit . . . with [Carver].'"  Def's Counterstmt. ¶ 17 (quoting Summary Judgment Motion, Ex. 1 (PFS)).  But Mr. Cedillo responds that he signed and submitted the PFS to Carver after a "neighborhood mortgage broker called Rita" prepared the application on his behalf.  Cedillo Decl. ¶ 15.

Here, the record shows that on April 4, 2005, Mr. Cedillo submitted a PFS to Carver for the purpose of inducing Carver to lend the Corporations funds.  The record also shows that Mr. Cedillo signed the PFS, and that this is "sufficient, as a matter of law . . . to conclude that the

document was 'written' by [him]." *In re Kelley*, 163 B.R. at 35 (quoting *In re Boice*, 149 B.R. at 40).

For these reasons, and based on the entire record, Carver has established that there is no genuine dispute as to a material fact as to the first element of its Section 523(a)(2)(B) claim, that Mr. Cedillo executed a statement in writing in connection with the debt at issue.

<u>*Whether Carver Has Established that the PFS Is Materially False*</u>

The second element that Carver must establish is that the PFS is materially false. That is, Carver must show that there is no genuine dispute as to a material fact that the PFS paints a substantially untruthful picture of Mr. Cedillo's financial condition.

Carver argues that in the PFS, Mr. Cedillo represented that he was the 100 percent owner of Troutman, 654 Myrtle, and 1111 Willoughby. Pl's Mem. at 8. And Carver alleges that Mr. Cedillo "is not, and never was, the 100% of Troutman, 654 Myrtle, and 1111 Willoughby," and that any "ownership interest that [Mr. Cedillo] maintains in Troutman, 654 Myrtle and 1111 Willoughby is shared with other members of his family." Compl. ¶¶ 39-40. In support of its argument, Carver cites the deposition testimony of Mr. Cedillo, in which he states that he did not own 100 percent of any of the Corporations. Carver argues that information contained in the PFS was of the type that affected its decision to lend the funds to the Corporations. And as such, Carver argues that the misrepresentations contained in the PFS render the document materially false under Section 523(a)(2)(B).

Mr. Cedillo responds that his "statement that he was the sole shareholder of the Corporations did not paint a false financial picture" of his financial condition." Opp. at 12. He argues that "[n]one of his family members ever exerted any ownership interest in the Corporations listed in the PFS, or interfered with Carver's efforts to foreclose on the properties."

Opp. at 12.  And Mr. Cedillo argues that his family members gave him permission to mortgage the Properties, and as a result, any misstatements contained in the PFS "did not distort [his] financial circumstances."  Cedillo Decl. ¶ 18.

Here, the record shows that in the PFS, Mr. Cedillo stated that he was the 100 percent owner of Troutman, 654 Myrtle, and 1111 Willoughby.  The record also shows that at the Section 341 Meeting, Mr. Cedillo gave testimony that was inconsistent with those representations.  Specifically, when asked whether he was, or is currently, the 100 percent owner of Troutman, 654 Myrtle, and 1111 Willoughby, Mr. Cedillo responded that he is not, and was never, the 100 percent owner of the Corporations.

The record also shows that Carver relied on Mr. Cedillo's representations in deciding whether to make the Loans to the Corporations.  Specifically, the record shows that it is Carver's "standard practice in evaluating the creditworthiness of individuals seeking to borrow money from it, or individuals who will be guaranteeing the payment of obligations of another entity or person."  Pl's Stmt., ECF No. 24, ¶ 15.  In other words, the record shows that the PFS painted a substantially untruthful picture of Mr. Cedillo's financial condition, and that made it materially false.

For these reasons, and based on the entire record, Carver has established that there is no genuine dispute as to a material fact as to the second element of its Section 523(a)(2)(B) claim, that the PFS is materially false.

### Whether Carver Has Established that the PFS Concerns Mr. Cedillo's Financial Condition

The third element that Carver must establish is that the PFS concerns Mr. Cedillo's financial condition.  That is, Carver must show that there is no genuine dispute as to a material

fact that at the time Mr. Cedillo submitted the PFS to Carver, it concerned his financial condition.

Carver argues that "[i]t is axiomatic that the PFS concerns [Mr. Cedillo's] financial condition as it seeks detailed information pertaining to his income, assets, and liabilities." Pl's Mem. at 8. It also argues that the name of the document alone, Personal Financial Statement, also "makes it abundantly clear that the PFS concerns [Mr. Cedillo's] financial condition." *Id.*

In response, Mr. Cedillo acknowledges that the PFS concerns his financial condition.

Here, the record shows that the PFS contains information related to Mr. Cedillo's financial condition. Specifically, the record shows that the PFS contains information pertaining to, among other things, Mr. Cedillo's income, assets, and liabilities.

For these reasons, and based on the entire record, Carver has established that there is no genuine dispute as to a material fact as to the third element of its Section 523(a)(2)(B) claim, that the PFS contains information that concerns Mr. Cedillo's financial condition.

*Whether Carver Has Established that It Reasonably Relied on Mr. Cedillo's Statements*

The fourth element that Carver must establish is that it reasonably relied on Mr. Cedillo's statements in connection with making the Loans at issue here. That is, Carver must show that there is no genuine dispute as to a material fact that it reasonably relied on the materially false PFS when it decided to make the Loans to the Corporations.

Carver argues that it "followed its standard procedure when issuing the Loans and, in doing so, it relied on the materially false PFS when making the Loans," and that it is Carver's "normal business practice" to rely on a borrower's personal financial statements in determining whether to extend credit. Pl's Mem. at 9-10.

In response, Mr. Cedillo acknowledges that Carver reasonably relied on the PFS in connection with making the Loans.

Here, the record shows that Carver relied on the materially false PFS reflecting Mr. Cedillo's financial condition when it decided to make the Loans to the Corporations.  The record also shows that Carver's reliance on the PFS was reasonable and in the normal course of its business practices.

For these reasons, and based on the entire record, Carver has established that there is no genuine dispute as to a material fact as to the fourth element of its Section 523(a)(2)(B) claim, that Carver relied on the materially false PFS in deciding whether to make the Loans to the Corporations.

*Whether Carver Has Established that Mr. Cedillo Submitted the PFS with the Intent to Deceive Carver*

The fifth element that Carver must establish is that Mr. Cedillo submitted the PFS with the intent to deceive Carver.  That is, Carver must show that there is no genuine dispute as to a material fact that Mr. Cedillo submitted the materially false PFS with the intent to deceive Carver into making the Loans to the Corporations.

Carver argues, in substance, that "the totality of circumstances permits an inference that [Mr. Cedillo] intended to deceive Carver by submitting [the] PFS containing materially false information for the purpose of inducing Carver to make the Loans."  Pl's Mem. at 10. Specifically, Carver argues that "[c]onsidering that [Mr. Cedillo] never owned 100% of the Corporations, the only possible conclusion is that he intended to deceive Carver when signing and submitting the PFS which represented otherwise."  Pl's Mem. at 10.  Carver also argues that because Mr. Cedillo "expressly acknowledged that he was submitting the PFS 'for the purpose of procuring, establishing and mainlining credit . . . with [Carver]'" and that Carver would rely on

the representations in the PFS, this is sufficient to support the inference that the PFS was submitted with the intent to deceive Carver into making the Loans. Pl's Mem. at 10 (quoting Summary Judgment Motion, Ex. 1 (PFS)).

Carver also argues that Mr. Cedillo's assertions that he did not read the PFS or have it read to him similarly demonstrate that he had the intent to deceive Carver. Specifically, Carver argues that "[i]f a debtor does 'not read a statement prepared for him by another party that would, in and of itself, constitute reckless disregard equivalent to intent.'" Reply Mem., ECF No. 35, at 2. As a result, Carver argues Mr. Cedillo is not shielded from "the ramifications resulting therefrom." Pl's Mem. at 3. In sum, Carver argues that Mr. Cedillo's conclusions "are not supported by law and, if accepted, would allow any debtor who has submitted a false financial statement to escape liability by simply claiming that he did not read the statement." Pl's Mem. at 2.

Mr. Cedillo responds, in substance, that "a reasonable trier of fact could easily conclude that [he] did not have the requisite intent when he submitted the PFS to defraud Carver." Opp. at 13. Specifically, Mr. Cedillo argues that he is "English illiterate and an uneducated laborer who could not complete the application himself," and that because of this, "he [cannot] comprehend some of the most rudimentary corporate law concepts, and does not fully understand the distinction between an equitable and nominal property owner." Opp. at 13.

Mr. Cedillo also states that he "did not believe, when [he] submitted the PFS, that [he] was the sole equitable owner of the [Corporations] . . . [but] that [he] may have been the nominal owner at that time. Its just not clear from [his records]." Cedillo Decl. ¶ 18. Additionally, Mr. Cedillo argues that because both the PFS and "the corporate documents [publically] available list

[Mr. Cedillo] as the named president and sole shareholder of the corporations," Mr. Cedillo did not intend to deceive Carver by listing the same on his PFS. Opp. at 13-14.

Here, the record shows that Mr. Cedillo listed himself as the 100 percent owner of Troutman, 654 Myrtle, and 1111 Willoughby on the PFS. The record also shows that Mr. Cedillo testified that he does not, and never did, own 100 percent of the Corporations. Specifically, the record shows that when asked whether he owned 100 percent of each of the Corporations, Mr. Cedillo responded that he never owned the Corporations, but was president of both Troutman and 1111 Willoughby. And the record shows, and Carver and Mr. Cedillo agree, that Carver relied on Mr. Cedillo's representation when it decided to make the Loans to the Corporations.

But the record also shows that Mr. Cedillo may not have understood or believed himself to be the 100 percent owner of the Corporations. And the record shows that Mr. Cedillo "does not fully understand the distinction between an equitable and nominal property owner." Opp. at 13. As he states, when he submitted the PFS, he "did not believe . . . that [he] was the sole equitable owner . . . [but he] may have been the nominal owner at that time." Cedillo Decl. ¶ 18.

Additionally, the record shows that Mr. Cedillo's representations do not rise to the level of a "reckless disregard for the truth so as to be the 'equivalent of intent to defraud.'" *In re Boice*, 149 B.R. at 47 (quoting *In re Biedenharn*, 30 B.R. at 345). As this Court has observed, "while recklessness may be a sufficient basis to infer knowledge, it does not, without more, demonstrate a deliberate intention to cheat or mislead". *New York v. Suarez (In re Suarez)*, 367 B.R. 332, 367 (Bankr. E.D.N.Y. 2007).

The record also shows that Mr. Cedillo has limited fluency in English, limited schooling, and completed no formal education since emigrating from Ecuador to the United States in 1989.

And the record shows that Mr. Cedillo was aware of this, and "asked for the assistance of a neighborhood mortgage broker . . . in preparing [his] application," and "answer[ed] the broker's questions" with respect to completing the PFS.  Cedillo Decl. ¶ 15.

That is, Mr. Cedillo has offered plausible alternative explanations for the circumstances leading to the submission of the false PFS to Carver.  And as such, Carver has not shown that when Mr. Cedillo signed and submitted the PFS to Carver, he had the intent to deceive Carver, or that he acted with a reckless disregard for the truth of the PFS that would amount to an intent to deceive.

For these reasons, and based on the entire record, Carver has not established that there is no genuine dispute as to a material fact as to the fifth element of its Section 523(a)(2)(B) claim, that Mr. Cedillo submitted the PFS with the intent to deceive Carver.

*          *          *

In sum, Carver has shown that there are no genuine disputes as to a material fact as to the first, second, third, and fourth elements of its First Claim for Relief, seeking a determination that the debt owed to Carver is nondischargeable pursuant to Bankruptcy Code Section 523(a)(2)(B), that Mr. Cedillo submitted a statement in writing, that the statement is materially false, that the statement concerns Mr. Cedillo's financial condition, and that Carver reasonably relied on the statement when deciding whether to make the Loans to the Corporations.  But Carver has not shown that there is no genuine dispute as to the fifth element of this claim, that Mr. Cedillo submitted that statement – the PFS – with the intent to deceive Carver.  For these reasons, and based on the entire record, Carver's Motion for Summary Judgment on the First Claim for Relief is denied.

*Whether Carver Has Shown that It Is Entitled to Summary Judgment on its Second Claim for Relief – Denial of Discharge Under Bankruptcy Code Section 727(a)(2)*

Carver seeks the entry of an order granting partial summary judgment in its favor denying Mr. Cedillo a discharge under Bankruptcy Code Section 727(a)(2), on grounds, among others, that the Hardware Store Assets were Mr. Cedillo's property, and that he transferred those assets with the actual intent to hinder, delay, or defraud his creditors.

Mr. Cedillo responds that summary judgment is not warranted.  He states that the Hardware Store Assets were not his property when the assets were transferred to NY Electric, and disputes that they were transferred with the intent to hinder, delay, or defraud his creditors. At a minimum, Mr. Cedillo argues that there are genuine disputes as to material facts as to whether the Hardware Store Assets were his property, whether he made the transfer, and whether he made the transfer with intent to hinder, delay, or defraud.

The record shows that the parties agree as to certain material facts that concern this claim, and disagree as to others, as follows.

*K&R Hardware and the Hardware Store Assets*

Carver and Mr. Cedillo agree that K&R Hardware was located and operated at 645 Myrtle Avenue in Brooklyn.

Carver and Mr. Cedillo disagree with respect to the ownership of K&R Hardware and the Hardware Store, including whether Mr. Cedillo was the sole equitable owner of K&R Hardware. That is, Mr. Cedillo states that both he "and his long-time companion and present wife, Rosa Vasquez owned and operated the Hardware Store for many years."  Def's Counterstmt. ¶ 32.

*The Hardware Store Transfer*

Carver and Mr. Cedillo agree that on October 1, 2012, K&R Hardware and the Hardware Store Assets were transferred to NY Electric.  They also agree that the purchase price for the

Hardware Store Assets was $50,000, reflected in a note.  And Carver and Mr. Cedillo agree that NY Electric, by Ms. Vasquez, "executed a Promissory Note . . . in the amount of $50,000, payable to Defendant . . . ."  Def's Counterstmt. ¶ 38.  Additionally, they agree that Mr. Cedillo "failed to pay substantial amounts of sales tax to New York State, which was incurred as a result of the operation of the Hardware Store," and that he "transferred the assets of the Hardware Store to prevent New York from closing the Hardware Store."  Def's Counterstmt. ¶¶ 33, 37.  And they agree that "[n]o payments have ever been made to [Mr. Cedillo] pursuant to the Note."  Def's Counterstmt. ¶ 40.

However, Carver and Mr. Cedillo disagree with respect to two significant material facts, which are whether Mr. Cedillo himself or K&R Hardware transferred K&R Hardware's assets to NY Electric, and whether the Hardware Store Assets were Mr. Cedillo's property at the time of the transfer.

### *The Question of Intent*

Carver and Mr. Cedillo disagree with respect to a key element of Carver's Section 727(a)(2) claim, Mr. Cedillo acted with intent to hinder, delay, or defraud his creditors, including Carver, when he "transferred, removed, destroyed, mutilated, or concealed" his assets.

The elements of a claim to deny a debtor's discharge under Bankruptcy Code Section 727(a)(2)(A) are that "(1) the debtor transferred property; (2) said property belongs to the debtor; (3) the transfer occurred with actual intent to hinder, delay, or defraud; and (4) the transfer occurred within one year prior to the filing for bankruptcy." *In re Kablaoui*, 196 B.R. at 708. The Court considers each of these elements in turn.

_Whether Carver Has Established that Mr. Cedillo Transferred the Hardware Store Assets_

The first element that Carver must establish is that Mr. Cedillo transferred property. That is, Carver must establish that there is no genuine dispute as to a material fact that Mr. Cedillo transferred the Hardware Store Assets to NY Electric.

Carver argues that Mr. Cedillo transferred the Hardware Store Assets to NY Electric on October 1, 2012. In support of its argument, Carver cites to the October 1, 2012 bill of sale, which states that "Cesar M. Cedillo, _both individually and as sole shareholder_ of Kevin and Richard Hardware Corp., formerly a New York Corporation, dissolved by proclamation on January 26, 2011" transferred the Hardware Store Assets to NY Electric. Summary Judgment Motion, Ex. 16 (Bill of Sale) (emphasis added). Carver also points to language contained in the bill of sale, which is "signed by the Defendant in his individual capacity," and which states that the "[t]ransferor is the sole and absolute owner of the property described in the foregoing bill of sale . . . and has full right and authority to sell and transfer the same." Reply Mem. at 5 (quoting Summary Judgment Motion, Ex. 16 (Bill of Sale)). In addition, Carver cites to Mr. Cedillo's deposition testimony, in which he states that he sold the Hardware Store Assets to NY Electric.

Mr. Cedillo responds, in substance, that he did not transfer property in which he had an interest to NY Electric within one year of the Petition Date. Mr. Cedillo states that "[t]he Debtor caused K&R Hardware to transfer its assets to NY Electric," and that he "did not own K&R [Hardware's] assets." Def's Counterstmt. ¶ 35. Specifically, Mr. Cedillo states that the dissolution by proclamation of K&R Hardware did not revert title to the Hardware Store Assets to him. He argues that "'a dissolved corporation continues to survive only for the purpose of liquidating its assets and satisfying any existing liabilities and obligations.'" Opp. at 15 (quoting _Kos P. St. Realty Corp. v. Elw, Inc._, No. LT 525-2014, slip op. at 12 (Peekskill City Ct. June 26,

2015)).  That is, Mr. Cedillo argues that the transfer of the Hardware Store Assets did not amount to a transfer of his property, and instead was a transfer of property of K&R Hardware, "since Hardware had significant unpaid liabilities."  Opp. at 15.

"Transfer" is defined in Bankruptcy Code Section 101(54) as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with – (i) property; or (ii) an interest in property."  11 U.S.C. § 101(54)(D)(i)-(ii).  "Although the legislative history offers no guidance in interpreting 'transfer' in the context of Section 727(a)(2)(A), the legislative history of Section 101(54), which defines 'transfer,' explains that '[t]he definition of transfer is as broad as possible'" to include any disposition of property or an interest in property.  *Martin v. Bajgar (In re Bajgar)*, 104 F.3d 495, 498 (1st Cir. 1997) (quoting S. Rep. No. 989, 95th Cong. 27 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5813)).

Carver and Mr. Cedillo do not dispute that on October 1, 2012, K&R Hardware and the Hardware Store Assets were transferred to NY Electric.  Rather, the parties dispute whether *Mr. Cedillo himself* or *K&R Hardware* transferred those assets.

Here, the record shows that the bill of sale provides that "Cesar M. Cedillo, both individually and as sole shareholder of Kevin and Richard Hardware Corp., formerly a New York Corporation, dissolved by proclamation on January 26, 2011," transferred the Hardware Store Assets to NY Electric.  Summary Judgment Motion, Ex. 16 (Bill of Sale)).  In addition, the record shows that the bill of sale, which is "signed by [Mr. Cedillo] in his individual capacity," states that the "[t]ransferor is the sole and absolute owner of the property described in the foregoing bill of sale . . . and has full right and authority to sell and transfer the same."  Reply Mem. at 5.

The record also shows that Mr. Cedillo testified at his deposition that he transferred the Hardware Store Assets to NY Electric:

Q:      Did you transfer the hardware store to New York Electric?

A:      I sold it, yes.

Q:      You sold it?

A:      Yes.

Q:      And at the time you sold it, you knew that you owed money to [New York] State for taxes; is that right?

A:      Yeah.

Q:      So you transferred it to [Ms. Vasquez] or New York Electric so that the State wouldn't shut it down?

A:      That's the reason I sold it, because she was going to lose everything.

Pl's Mem. at 11-12.

That is, the record shows that Mr. Cedillo transferred the Hardware Store Assets both in his individual capacity and on behalf of K&R Hardware.  As a consequence, Carver has shown that there is no genuine dispute as to a material fact that a transfer of the Hardware Store Assets occurred, and that Mr. Cedillo made the transfer.

For these reasons, and based on the entire record, Carver has established that there is no genuine dispute as to a material fact as to the first element of its Section 727(a)(2)(A) claim, that Mr. Cedillo transferred the Hardware Store Assets.

*Whether Carver Has Established that the Transfer of the Hardware Store Assets Was a Transfer of an Interest of Mr. Cedillo in Property*

The second element that Carver must establish is that the transferred property belonged to Mr. Cedillo.  That is, Carver must show that there is no genuine dispute as to material fact that at

least some of the Hardware Store Assets that Mr. Cedillo transferred to NY Electric constituted

his property.

Carver argues that "there can be no doubt that [Mr. Cedillo] exercised complete dominion

over the Hardware Store with respect to the transfer." Reply Mem. at 5. Carver argues that "'a

court may pierce the corporate veil of a business and treat its assets as the debtor's individual

property, and, thus, property of the debtor's estate, under an alter ego theory.'" Reply Mem. at 5

(quoting *Pisculli v. T.S. Haulers, Inc. (In re Pisculli*, 426 B.R. 52, 60 (Bankr. E.D.N.Y. 2010)).

That is, Carver argues that Mr. Cedillo "exercised complete domination over the Hardware Store,

. . . transferred the property in his own name and for his own benefit, [and] 'ignored corporate

formalities' by treating the assets as his own . . . ." Reply Mem. at 6.

Mr. Cedillo responds that the "assets belonged to the corporate entity and not the

[himself] individually at the time of the transfer." Opp. at 15. He argues that because K&R

Hardware had significant outstanding tax debts at the time of its dissolution, it was authorized to

"sell its assets for sale, . . . discharge or pay its liabilities, and do other acts in furtherance of

winding down." Opp. at 15. That is, Mr. Cedillo argues that title to the Hardware Store Assets

remained with K&R Hardware and did not pass to him individually.

"Because the Bankruptcy Code does not define 'interests in property,' state law controls."

*Kaufman*, 31 F. App'x at 208. One applicable area of state law concerns piercing the corporate

veil. As the New York Court of Appeals has observed:

> The concept of piercing the corporate veil is a limitation on the accepted
> principles that a corporation exists independently of its owners, as a separate legal
> entity, that the owners are normally not liable for the debts of the corporation, and
> that it is perfectly legal to incorporate for the express purpose of limiting the
> liability of the corporate owners.

*Morris v New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 140 (1993).  Under New

York law, piercing the corporate veil requires that "(1) the owners exercised complete

domination of the corporation in respect to the transaction attacked; and (2) that such domination

was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."

*Morris*, 82 N.Y.2d at 141.

      Complete domination of the corporation includes "'when the corporation has been used

as an alter ego.'"  *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131,

138 (2d Cir. 1991) (quoting *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d

698, 703 (2d Cir. 1990)).  And "control must be demonstrated 'in respect to the transaction

attacked.'"  *InSITE Servs. Corp. v. Am. Elec. Power Co. (In re InSITE Servs. Corp.)*, 287 B.R.

79, 96 (Bankr. S.D.N.Y. 2002) (quoting *Morris*, 82 N.Y.2d at 141).

      "While complete domination of the corporation is the key to piercing the corporate veil

. . . some showing of a [fraud or] wrongful or unjust act toward plaintiff is required."  *Morris*, 82

N.Y.2d at 141-42.  A plaintiff may also show that the defendant "commit[ed] a fraud or other

wrong that resulted in an unjust loss or injury."  *Freeman v. Complex Computing Co.*, 119 F.3d

1044, 1053 (2d Cir. 1997).  That is, the corporate veil may be pierced where the defendant used

its domination to commit a "'wrong, fraud, or the breach of a legal duty, or a dishonest and

unjust act in contravention of plaintiff's legal rights, and that the control and breach of duty

proximately caused the injury complained of.'"  *Freeman*, 119 F.3d at 1052 (quoting *Elec.*

*Switching Indus., Inc. v. Faradyne Elec. Corp.*, 833 F.2d 418, 424 (2d Cir. 1987)).

      Examples of "complete domination" for purposes of piercing the corporate veil include:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the
> corporate existence, i.e., issuance of stock, election of directors, keeping of
> corporate records and the like, (2) inadequate capitalization, (3) whether funds are
> put in and taken out of the corporation for personal rather than corporate

purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc.*, 933 F.2d at 139.

Here, Carver looks to certain of these considerations, and Mr. Cedillo responds as follows.

The absence of the formalities and paraphernalia that are part and parcel of the corporate existence. Carver argues that "to the extent the property was actually owned by the Defendant, he ignored corporate formalities by treating the assets as his own and having the . . . Note be paid directly to him." Reply Mem. at 6. In response, Mr. Cedillo acknowledges that he and Ms. Vasquez "did not follow corporate formalities when [they] formed [K&R Hardware]," and that there are no corporate records or "paraphernalia that are part and parcel of the corporate existence." Cedillo Decl. ¶ 12; *Wm. Passalacqua Builders, Inc.*, 933 F.2d at 139. The record shows that in transferring the Hardware Store Assets, Mr. Cedillo signed the Bill of Sale "both *individually* and as sole shareholder of Kevin & Richard Hardware Corp." Summary Judgment Motion, Ex. 16 (Bill of Sale) (emphasis added). And notably, at the time of the transfer of the Hardware Store Assets, K&R Hardware had been dissolved for some twenty months. For these reasons, this factor weighs in favor of a finding of complete domination.

Whether funds are put in and taken out of the corporation for personal rather than corporate purposes. Carver argues that Mr. Cedillo owned the Hardware Store Assets personally, and that the Note executed by his wife's company is made payable to Mr. Cedillo, not the Hardware Store. Mr. Cedillo responds, in substance, that the transfer of the Hardware

Store Assets was made by K&R Hardware, not by him.  The record shows that the Note executed by NY Electric and in favor of Mr. Cedillo as additional consideration for the Hardware Store Assets, lists Mr. Cedillo as the "Lender," lists his home address, and also provides that "the Lender has loaned to [NY Electric] the sum of Fifty Thousand Dollars."  Summary Judgment Motion, Ex. 15.  That is, the terms of the Note are consistent with an imprecise distinction between Mr. Cedillo's funds and assets and those of the corporation.  For these reasons, this factor weighs in favor of a finding of complete domination.

Overlap in ownership, officers, directors, and personnel.  Carver argues that Mr. Cedillo "was the sole shareholder of the Hardware Store," and described himself as the sole shareholder of 656 Myrtle.  Pl's. Mem at 16; Reply Mem. at 6.  And here again, Mr. Cedillo responds, in substance, that the transfer of the Hardware Store Assets was made by K&R Hardware, note by him.  The record shows that Mr. Cedillo worked at the Hardware Store "on and off" until October 1, 2012, and that on July 7, 2014, he executed an affidavit stating that he was "presently conducting [his] hardware store business at the property."  Summary Judgment Motion, Ex. 13 at 37 (Deposition of Cesar Cedillo); Ex. 17 at 1 (2014 Affidavit).  The record also shows that Mr. Cedillo disavows that affidavit, and that the extent to which Mr. Cedillo worked "off and on" at K&R Hardware during this time is not clear.  At the same time, the record shows that Mr. Cedillo, Ms. Vasquez, and members of their families maintained overlapping roles in connection with K&R Hardware and their other business activities.  For these reasons, this factor to some extent in favor of a finding of complete domination.

Whether the related person deals with the dominated corporation at arm's length.  Carver argues in substance that Mr. Cedillo did not deal with the Hardware Store at arm's length, but "exercised complete domination over [it] with respect to the transfer."  Reply Mem. at 5.  Mr.

Cedillo again responds, in substance, that the transfer of the Hardware Store Assets was made by K&R Hardware, not by him. The record shows that prior to selling the Hardware Store Assets to NY Electric, Mr. Cedillo had the Hardware Store Assets appraised, using an independent company to arrive at the value of $50,000. Mr. Cedillo also stated at the Section 341 Meeting that "I sold [K&R Hardware]." Summary Judgment Motion, Ex. 8 at 17:14 (Transcript from 341 Meeting of Creditors). And the record shows that he is the only representative of K&R Hardware to sign the Bill of Sale and Note on behalf of K&R Hardware, and as a result, he is entitled to payment from NY Electric. For these reasons, this factor weighs to some extent in favor of a finding of complete domination.

That is, several of the relevant considerations weigh in favor of the conclusion that Mr. Cedillo exercised "complete domination" over the activities of K&R Hardware. But domination of the corporation's activities and enterprise is not enough to trigger the consequence of piercing the corporate veil, and Carver must also show that Mr. Cedillo used his domination of the corporate entity to commit "a [fraud or] wrongful or unjust act toward plaintiff." *Morris*, 82 N.Y.2d at 141-42.

Carver argues that the corporate veil should be pierced because Mr. Cedillo transferred the Hardware Store Assets because "the clear purpose" of Mr. Cedillo's transfer of the Hardware Store Assets "was to avoid the debt owed to the State of New York, not to repay it." Reply Mem. at 6. In response, Mr. Cedillo denies that he acted with intent to avoid his debts or to defraud his creditors, and as set forth below, he has identified plausible alternative explanations for the circumstances identified by Carver, including that the "transfer was done in consultation with NYS, and in an effort to repay that debt." Cedillo Decl. ¶ 16.

Here, the record shows that several factors support the conclusion that Mr. Cedillo exercised "complete domination" over the activities of K&R Hardware.  These include that the absence of corporate documentation and other formalities, the continuing operation of K&R Hardware and the imprecise distinction maintained between Mr. Cedillo's funds and assets and those of the corporation, the overlap in roles undertaken by Mr. Cedillo and his family members, and Mr. Cedillo's role in the sale of the Hardware Store Assets to NY Electric.  At the same time, the record does not show that Mr. Cedillo made the sale to commit a fraud or an unjust or unlawful act with respect to Carver.  While Carver has identified circumstances that may be consistent with that conclusion, Mr. Cedillo has come forward with plausible alternative explanations for those circumstances.

Another applicable area of state law is the law concerning the operations of a corporation after it is dissolved.  Under New York Business Corporation Law ("NY BCL") Sections 1005(a) and 1009, following the dissolution of a corporation, "[a] corporation shall carry on no business except for the purposes of winding up its affairs."  NY BCL § 1005(a)(1).  "The corporation shall proceed to wind up its affairs, with power to fulfill or discharge its contracts, collect its assets, sell its assets for cash at public or private sale, discharge or pay its liabilities, and do all other acts appropriate to liquidate its business."  NY BCL § 1005(a)(2).  "Until dissolution is complete, title to the corporate assets remains in the corporation."  *Rodgers v. Logan*, 121 A.D.2d 250, 253 (N.Y. App. Div. 1st Dep't 1986).

Following dissolution, "the shareholders to whom are distributed the remaining assets of the corporation are said to 'hold the assets which they received in trust for the benefit of creditors.'"  *Rodgers*, 121 A.D.2d at 253 (quoting *Plastic Contact Lens Co. v. Frontier of the NE.*, 324 F. Supp. 213, 220 (W.D.N.Y. 1969), *aff'd*, 441 F.2d 67 (2d Cir. 1971)).  *See Plastic*

*Contact Lens Co.*, 324 F. Supp. at 220 (stating that "upon the dissolution of a corporation, provisions must be made for the payment of liabilities before the distribution of assets to the shareholders. The defendant shareholders hold the assets which they received, in trust for the benefit of creditors.").

If the individual shareholders and officers of a dissolved corporation continue to conduct a corporation's business post-dissolution, and not for the purposes of winding up the former corporation's affairs, they may become personally liable for obligations incurred by the corporation during its pre-dissolution activities. As one court found, where the defendant "fail[ed] to show that entering into the lease was necessary to the winding up of the corporation's affairs," the defendant was "personally liable for the rent due under the subject lease . . . ." *Pa. Bldg. Co. v. Schaub*, 14 A.D.3d 365, 366 (N.Y. App. Div. 1st Dep't 2005).

As another court held, the plaintiffs were entitled to summary judgement against the individual defendants "based upon evidence establishing that those defendants were . . . officers of the corporate defendant and that the corporate defendant, a general contractor, although dissolved by proclamation for nonpayment of franchise taxes . . . was utilized to enter into subcontract agreements with plaintiff, and then failed to pay plaintiff for its services thereunder." *Keystone Mech. Corp. v. Conde*, 309 A.D.2d 627, 627 (N.Y. App. Div. 1st Dep't 2003). *See Brandes Meat Corp. v. Cromer*, 146 A.D.2d 666, 667 (N.Y. App. Div. 2d Dep't 1989) (concluding that "[t]he defendant, in effect, purported to act on behalf of a corporation which had neither a de jure nor a de facto existence . . . and he is therefore personally responsible for the obligations which he incurred.").

To the same effect, if the individual shareholders and officers of a dissolved corporation continue to conduct the corporation's business after it is dissolved, and do so for purposes other

than winding up the former corporation's affairs, they may become personally responsible for the business activities of the enterprise. In one case, a corporation entered into "a new business relationship with plaintiff for the purpose of obtaining fuel deliveries and supplies" nearly ten years after it was dissolved. *Long Oil Heat Inc. v. Polsinelli Jr.*, 128 A.D.3d 1296, 1298 (N.Y. App. Div. 3d Dep't 2015). There, the court found that the corporation's activities did not "constitute [the] winding up of its corporate affairs but, rather, amount to the pursuit of new business for which [the defendant] indeed is personally liable." *Long Oil Heat Inc.*, 128 A.D.3d at 1298.

Here, the record shows that the Hardware Store Assets were transferred on October 1, 2012, within one year preceding the April 24, 2013 Petition Date. The record also shows that at the time of the transfer, K&R Hardware had significant unpaid liabilities that were owed to, among others, New York State. And Mr. Cedillo stated under oath that he "would transfer the assets to [NY Electric] and that corporation would settle my outstanding tax debt" and that "the Hardware Store [A]ssets were transferred to NY Electric on October 1, 2012." Cedillo Decl.¶¶ 34, 36.

The record also shows that Mr. Cedillo was the sole legal owner of K&R Hardware and an equitable owner of K&R Hardware with Ms. Vasquez, and that he was responsible for K&R Hardware with respect to its obligations owed to New York State. Carver and Mr. Cedillo do not dispute that the transfer of the Hardware Store Assets did not occur until October 1, 2012.

And the record shows that Mr. Cedillo continued to operate K&R Hardware over the course of some twenty months between K&R Hardware's dissolution on January 26, 2011 and the transfer of K&R Hardware to NY Electric on October 1, 2012. That is, Mr. Cedillo, as an officer of K&R Hardware, continued to carry on the corporation's business post-dissolution,

"and not for the purposes of winding up the former corporation's affairs."  As a result, Mr.

Cedillo remained personally liable for the obligations that K&R Hardware incurred between

January 26, 2011 and October 1, 2012.  In other words, any property acquired as a result of

carrying on the business after it was dissolved belonged to Mr. Cedillo, and was not property of

the dissolved corporation.

As a consequence, Carver has shown that there is no genuine dispute as to a material fact

that at least some of the Hardware Store Assets were property of Mr. Cedillo.  That is, Carver

has established that there is no genuine dispute as to a material fact as that at least some of the

Hardware Store Assets constituted property of Mr. Cedillo when he transferred them to NY

Electric.

For these reasons, and based on the entire record, Carver has established that there is no

genuine dispute as to a material fact as to the second element of its Section 727(a)(2)(A) claim,

that the transfer of the Hardware Store Assets was a transfer of an interest of Mr. Cedillo in

property.

### _Whether Carver Has Established that Mr. Cedillo Transferred the Hardware Store Assets with Intent To Hinder, Delay, or Defraud Creditors of His Estate_

The third element that Carver must establish is that Mr. Cedillo transferred the property

with the actual intent to hinder, delay, or defraud his creditors.  That is, Carver must show that

there is no genuine dispute as to a material fact that Mr. Cedillo transferred the Hardware Store

Assets to NY Electric with the actual intent to hinder, delay, or defraud creditors of his estate,

including Carver.

Carver argues that Mr. Cedillo transferred the Hardware Store Assets with actual intent to

hinder, delay, or defraud his creditors, including Carver and New York State.  Carver cites to the

deposition testimony of Mr. Cedillo, in which Mr. Cedillo "expressly conceded that the sole

reason for transferring the Hardware Store to his wife's company was to prevent the State of New York from collecting the sales taxes due and owing to it." Pl's Mem. at 12. That is, Carver argues that Mr. Cedillo transferred the Hardware Store Assets to NY Electric for the "clear purpose . . . to avoid the debt owes to the State of New York, not to repay it." Reply Mem. at 6. Carver argues that "[e]ven if [Mr. Cedillo] did not admit to this . . . the circumstances behind the transfer are sufficient to make an objective determination that such action was done with fraudulent intent." Pl's Mem. at 12. Carver also identifies several facts and circumstances surrounding the transfer, and argues that these "badges of fraud" point to the conclusion that the transfer was made with fraudulent intent.

Mr. Cedillo responds, in substance, that Carver has not come forward with evidence sufficient to meet the standard necessary to establish that he acted with fraudulent intent.

At the outset, it is worth noting that the barrier to establishing the absence of a genuine dispute as to a material fact with respect to an individual's intent is high. The Second Circuit has identified common badges of fraud that support the inference of an intent to hinder, delay, or defraud creditors. As noted above, these include:

(1)     the lack or inadequacy of consideration;

(2)     the family, friendship or close associate relationship between the parties;

(3)     the retention of possession, benefit, or use of the property in question;

(4)     the financial condition of the party sought to be charged both before and after the transaction in question;

(5)     the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6)     the general chronology of the events and transactions under inquiry.

*In re Kaiser*, 722 F.2d at 1582-83.  At the same time, these badges of fraud need to be viewed "in the context of the case and any probative evidence of innocent intent."  *Kramer v. Chin (In re Chin)*, 492 B.R. 117, 131 (Bankr. E.D.N.Y. 2013).

Here, Carver relies on three of these badges, and Mr. Cedillo responds to them as follows.

The lack or inadequacy of consideration.  Carver argues that "while the stated consideration for the Transfer was $50,000, [Mr. Cedillo] did not receive any funds or other consideration in exchange for transferring the Hardware Store to his wife's company."  Pl's Mem. at 12-13.  Carver also argues that "NY Electric executed a Promissory Note, dated October 1, 2012, in the amount of $50,000, payable to [Mr. Cedillo] in equal monthly payments of $1,454.06 from November 1, 2012 to October 2, 2015."  Pl's Mem. at 3.  And Carver argues that "the Note is secured by a Chattel Mortgage, dated October 1, 2012, in which NY Electric gave [Mr. Cedillo] a security interest in all of the assets that were simultaneously being retransferred to NY Electric."  Pl's Mem. at 3.  Carver argues that "[n]o payments have ever been made to [Mr. Cedillo] pursuant to the Note."  Pl's Mem. at 3.

In response, Mr. Cedillo does not dispute that no part of the cash consideration for the Hardware Store Assets has been paid by NY Electric.  Mr. Cedillo states that "because a Home Depot moved into the area and the [Hardware] [S]tore was not as profitable as they would have hoped," NY Electric could not repay the debt.  Trial Tr. 79, Nov. 21, 2016.  Mr. Cedillo also argues that "his bankruptcy attorney . . . [has] asked Rosa [Vasquez] to make the payments, but she stated she is unable to do so," and that the reason for the unpaid obligations to NYS and the SBA is because NY Electric has insufficient funds to make those payments."  Cedillo Decl. ¶ 40.

Here, the record shows that at the time of the sale of the Hardware Store Assets, consideration was given by NY Electric in the form of a $50,000 note and the assumption of certain liabilities – the NYS Tax Debt and the SBA Debt.  The record also shows that following the sale of the Hardware Store Assets, NY Electric has not made any payments on the note or those liabilities.  But the record does not show that *at the time* of the sale of those assets, there was a lack or inadequacy of consideration.  For these reasons, this badge does not weigh in favor of a finding of fraudulent intent.

The family, friendship or close relationship between the parties.  Carver argues that the family relationships among the parties involved in the transfer of the assets supports the inference that the transfer was the product of fraudulent intent.  Specifically, Carver argues that Mr. Cedillo's close relationship with Ms. Vasquez, the sole owner and managing member of NY Electric and Mr. Cedillo's live-in companion since 1989 and wife since 2013, supports the inference that the transfer of the Hardware Store Assets to NY Electric was carried out by the parties with the intent to hinder, delay, or defraud creditors of Mr. Cedillo's estate, including Carver.

Mr. Cedillo responds that the family relationship between the principals of the parties does not support an inference of fraudulent intent.  He argues that in light of K&R Hardware's "large tax debt and very little assets" the Hardware Store Assets "could not have been sold to a disinterested party."  Opp. at 17.  He also argues that the Hardware Store Assets were not sold to Ms. Vasquez, but to NY Electric.  And he states that after working with a business consultant, Humbert Suremott, Mr. Suremott advised Mr. Cedillo that "the Hardware Store could not continue to operate and that a newly entity has to be created with a clean slate to operate the

store and repay the taxes owed to [New York State]," and that soon thereafter, NY Electric was

incorporated with Ms. Vasquez as its sole managing member.  Cedillo Decl. ¶ 32.

Mr. Cedillo states that Mr. Suremott "spoke with a representative of [New York State]

and informed [New York State] that [Mr. Cedillo] would transfer the [Hardware Store Assets] to

a newly formed corporation and that corporation would settle [his] outstanding tax debt."

Cedillo Decl. ¶ 34.  He also states that "Suremott helped my wife incorporate NY Electric

Supplies LLC" and that "[w]ith the assistance of an attorney Marty O'Shea representing my

wife, the Hardware Store assets were transferred to NY Electric on October 1, 2012."  Cedillo

Decl.¶¶ 35-36.  And he states that he and Ms. Vasquez "never intended payments from NY

Electric to go to anyone but my creditors."  Cedillo Decl. ¶ 38.

Here, the record shows that on September 20, 2012, NY Electric was incorporated under

New York law and that Ms. Vasquez, Mr. Cedillo's wife, is its sole managing member.  The

record also shows that NY Electric was incorporated for the purpose of acquiring the Hardware

Store Assets and assuming certain liabilities, including the NYS Tax Debt and a United States

Small Business Administration loan.  And the record shows that less than two weeks after it was

formed, on October 1, 2012, NY Electric acquired those assets, and that Ms. Vasquez, his wife,

was represented by her own counsel in connection with that transaction.  That is, the record

shows that Mr. Cedillo and K&R Hardware transferred the Hardware Store Assets to NY

Electric, a new entity created for the purpose of acquiring those assets and controlled by Ms.

Vasquez, his wife.  In substance, this amounted to a transaction between Mr. Cedillo and Ms.

Vasquez, for the purpose of shifting certain of Mr. Cedillo's liabilities to NY Electric.  And even

if no other buyer could be found, the advice of a business consultant was sought, and separate

counsel represented Ms. Vasquez, the circumstances suggest the possibility of something other

than an arm's-length transaction.  For these reasons, this badge weighs to some extent in favor of a finding of fraudulent intent.

The retention of possession, benefit, or use of the property in question.  Carver argues that after the transfer of the Hardware Store Assets to NY Electric, Mr. Cedillo continued to operate the Hardware Store at the 645 Myrtle Avenue location in Brooklyn.  Carver also argues that Mr. Cedillo acknowledges in an affidavit that he signed in July 2014, that he conducted his hardware store business at the NY Electric store location.

Mr. Cedillo responds that he "ceased control" of the Hardware Store in October 2012, and that since that time, NY Electric, not he, operated the business.  Opp. at 17.  As a result of the transfer of control, he urges that he did not have possession, benefit, or use of the transferred property – that is, the Hardware Store Assets.

Mr. Cedillo also acknowledges that he signed an affidavit in July 2014 which states that he was conducting his hardware store at the NY Electric store location.  But he argues that he is "unable to read, and he signed the affidavit without realizing it contained this erroneous assertion."  Opp. at 17.  And Mr. Cedillo states that he speaks English, but cannot read or write in English, and that he "only attended school until the age of thirteen in Ecuador and completed no formal education since [immigrating] to the United States in 1989 with [his] family."  Cedillo Decl. ¶ 2.  Mr. Cedillo also argues that "because [he] was unable to read the statement and trusted [his] attorney, [he] signed the declaration without realizing it contained this incorrect statement."  Cedillo Decl. ¶ 43.

Here, the record shows that, on the one hand, Mr. Cedillo and K&R Hardware transferred the Hardware Store Assets to NY Electric, owned by Mr. Cedillo's wife, in October 2012, and that Mr. Cedillo stated in an affidavit in July 2014 that he conducted the Hardware Store

business at the NY Electric store location.  The record also shows that Mr. Cedillo has limited

fluency in English, and has disavowed that affidavit.  And the record does not include other

direct or indirect evidence as to the extent of Mr. Cedillo's personal ongoing involvement in the

Hardware Store business, including whether he possessed, benefited from, or used that business.

For these reasons, these remain genuine disputes of material facts as to this badge, and it weighs

neither in favor or nor against a finding of fraudulent intent.

For these reasons, and based on the entire record, Carver has not established that there is

no genuine dispute as to a material fact as to the third element of its Section 727(a)(2)(A) claim,

that Mr. Cedillo transferred the Hardware Store Assets with actual intent to hinder, delay, or

defraud his creditors.

### _Whether Carver Has Established that the Transfer of the Hardware Store Assets Occurred Within One Year of the Petition Date_

The fourth element that Carver must establish is that the property was transferred within

one year of the date that Mr. Cedillo filed his bankruptcy petition.  That is, Carver must show

that there is no genuine dispute as to a material fact that the transfer of the Hardware Store

Assets to NY Electric occurred within one year of April 24, 2013, the date that Mr. Cedillo

commenced his bankruptcy case.

Carver alleges that Mr. Cedillo transferred the Hardware Store Assets to NY Electric on

October 1, 2012.

Mr. Cedillo disputes that he transferred the Hardware Store Assets, and states that he

"caused K&R Hardware to transfer its assets to NY Electric.  The Defendant did not own K&R's

assets."  Def's Counterstmt. ¶ 35.

Here, the record shows that, whether it was Mr. Cedillo himself or K&R Hardware who

transferred the assets, the assets were transferred to NY Electric on October 1, 2012, as

evidenced by the bill of sale.  Because Mr. Cedillo filed his bankruptcy petition on April 24, 2013, the October 1, 2012 transfer occurred within one year of the petition date.

For these reasons, and based on the entire record, Carver has established that there is no genuine dispute as to a material fact as to the fourth element of its Section 727(a)(2)(A) claim, that the transfer occurred within one year prior to the filing of Mr. Cedillo's bankruptcy petition.

*          *          *

In sum, Carver has shown that there is no genuine dispute as to a material fact as to the first element of its Second Claim for Relief, to deny Mr. Cedillo a discharge pursuant to Bankruptcy Code Section 727(a)(2)(A), that Mr. Cedillo transferred the Hardware Store Assets, the second element of this claim, that the transfer of the Hardware Store Assets was a transfer of an interest of Mr. Cedillo in property, and the fourth element of this claim, that the transfer of the Hardware Store Assets occurred within one year of the Petition Date.  But Carver has not shown that there is no genuine dispute as to the third element of this claim, that Mr. Cedillo transferred the Hardware Store Assets with intent to hinder, delay, or defraud his creditors.  For these reasons, and based on the entire record, Carver's Motion for Summary Judgment on the Second Claim for Relief is denied.

### *Whether Carver Has Shown that It Is Entitled to Summary Judgment on its Fourth Claim for Relief – Denial of Discharge Under Bankruptcy Code Section 727(a)(4)(A)*

Carver seeks the entry of an order granting partial summary judgment in its favor denying Mr. Cedillo a discharge under bankruptcy code Section 727(a)(4)(A) on grounds, among others, that Mr. Cedillo knowingly and fraudulently, in connection with his bankruptcy case, made false oaths and accounts.  Specifically, Carver argues that Mr. Cedillo made false statements under oath in his Schedules and Statements, and that this was brought to light during his testimony at the Rule 2004 Examination and Section 341 Meeting.

Mr. Cedillo responds that summary judgment is not warranted. He denies that he intentionally omitted information or misstated information in his Schedules and Statements, and asserts that he has been forthcoming to the best of his ability in all of his representations in his bankruptcy case. Here too, as with Carver's Second Claim for Relief, he argues, at a minimum, that there are genuine disputes as to material facts as to whether he knowingly made false statements under oath in connection with his bankruptcy case and whether he made any false statements with the intent to deceive his creditors.

And as with Carver's Second Claim for Relief under Bankruptcy Code Section 727(a)(2), the record shows that the parties agree as to certain facts that concern this claim, and disagree as to others, as follows.

### The False Statements

Carver and Mr. Cedillo agree as to several material facts in connection with the disclosures in Mr. Cedillo's Schedules and Statements. They agree that "[i]n March and April 2011," Mr. Cedillo "received deposits into his bank account," and that he "did not disclose his receipt of the funds" in his Statement of Financial Affairs. Def's Counterstmt. ¶¶ 52-53. And the parties agree that "[i]n June and July 2011," Mr. Cedillo "received deposits to his bank account," and that he "did not disclose his receipt of the funds" in his Statement of Financial Affairs. Def's Counterstmt. ¶¶ 54-55.

But Carver and Mr. Cedillo disagree as to whether certain amounts that were owed to him were listed accurately in his bankruptcy filings. Carver and Mr. Cedillo also disagree as to whether he adequately disclosed his ownership interest in K&R Hardware in his Schedules and Statements. And they disagree as to whether Mr. Cedillo adequately disclosed his ownership

interest in 656 Myrtle Avenue, and whether he was a shareholder of 656 Myrtle Avenue at the time that his bankruptcy petition was filed.

*The Question of Intent*

As with its Section 727(a)(2)(A) claim, a key element of Carver's Section 727(a)(4)(A) claim to deny Mr. Cedillo's discharge is his intent, that is, whether Mr. Cedillo "knowingly and fraudulently" made a false oath or account in connection with his Chapter 7 bankruptcy case. And here as well, Carver and Mr. Cedillo disagree as to whether he acted knowingly and with fraudulent intent.

The elements of a claim to deny a debtor's discharge under Bankruptcy Code Section 727(a)(4)(A) are that (1) Mr. Cedillo made statements under oath in connection with his bankruptcy case; (2) the statements were false; (3) Mr. Cedillo knew the statements were false; (4) Mr. Cedillo made the statements with fraudulent intent; and (5) the statements materially related to Mr. Cedillo's bankruptcy case. *In re Murray*, 249 B.R. at 228. The Court considers each of these elements in turn.

*Whether Carver Has Established that Mr. Cedillo Made Statements Under Oath in Connection with His Bankruptcy Case*

The first element that Carver must establish is that Mr. Cedillo made statements under oath in connection with his bankruptcy case. That is, Carver must show that there is no genuine dispute as to a material fact that Mr. Cedillo made statements under oath here.

Carver argues, and the record shows, that on May 8, 2013, Mr. Cedillo filed his Schedules of Assets and Liabilities and Statements of Financial Affairs with the Court. And Carver argues that on August 6, 2013, Mr. Cedillo filed an amended Schedule B and amended Statement of Financial Affairs. Carver argues that Mr. Cedillo filed his Schedules and Statements under the penalty of perjury. Additionally, Carver argues that "[o]n June 5, 2013,

[Mr. Cedillo] appeared for a 341 meeting of the creditors and was questioned by the Chapter 7

trustee and other creditors," and that here, Mr. Cedillo "represented that the entirety of the

Petition was true and accurate."  Pl's Stmt. ¶ 26.

In response, Mr. Cedillo does not dispute that he made these filings in his bankruptcy

case, and that he made them under the penalty of perjury.  He also does not dispute that he

testified at the Section 341 Meeting.

Here, the record shows that on May 8, 2013, Mr. Cedillo filed his bankruptcy schedules

and statements with the Court.  The record also shows that he signed the May 8, 2013 filings

under the penalty of perjury.  And the record shows that Mr. Cedillo filed a Statement of

Financial Affairs, and that too was signed under the penalty of perjury.  In addition, the record

shows that on August 6, 2013, Mr. Cedillo filed an amended Schedule B and amended Statement

of Financial Affairs, and again, that he signed these documents under the penalty of perjury.

And the record shows that Mr. Cedillo testified as to the truthfulness of his petition at the Section

341 Meeting.

For these reasons, and based on the entire record, Carver has established that there is no

genuine dispute as to a material fact as to the first element of its Section 727(a)(4)(A) claim, that

Mr. Cedillo made statements under oath in connection with his bankruptcy case.

*Whether Carver Has Established that Mr. Cedillo's Statements Were False*

The second element that Carver must establish is that Mr. Cedillo's statements made

under oath were false.  That is, Carver must show that there is no genuine dispute as to a material

fact that Mr. Cedillo made at least some false statements under oath in connection with his

bankruptcy case.

Carver argues that Mr. Cedillo made false statements in his Schedules and Statements. Specifically, Carver argues that "[n]either Schedule B nor the SOFA made any reference to [Mr. Cedillo's] interest in the Hardware Store or his security interest in various assets transferred to his wife's company." Pl's Mem. at 4.  Specifically, Carver argues that in response to Question 18 of his Amended Statement of Financial Affairs, Mr. Cedillo did not disclose that he was an officer, director, or shareholder of K&R Hardware within the last six years.  And Carver argues that the security interest in the Hardware Store Assets was not disclosed by Mr. Cedillo on his Schedule B.  Further, Carver argues that "although he never received any payments toward the Note, [Mr. Cedillo] inexplicably claims that the Note was only worth $1.00" on his Schedule B. Pl's Mem. at 16.

Carver also argues that Mr. Cedillo failed to identify or disclose information in response to Questions 1 and 2 of his Statement of Financial Affairs.  Specifically, Carver argues that in addition to the amounts received on account of his regular employment, "in March and April 2011, [Mr. Cedillo] receive deposits into his bank account in the amount of $13,627.01 and in June and July 2011, [Mr. Cedillo] received deposits in his bank account in the amount of $8,475.86," all of which are not disclosed on his Statement of Financial Affairs.  Pl's Mem. at 17.

And Carver argues that Mr. Cedillo failed to disclose his ownership interest in 656 Myrtle Avenue.  Specifically, Carver argues that in 2006, Mr. Cedillo was the president and sole shareholder of 656 Myrtle Avenue, and that as of September 21, 2015, he "was still listed at the Chief Executive Office of 656 Myrtle [Avenue] and [Mr. Cedillo's] residence is listed at the Principal Executive office of 656 Myrtle [Avenue].  Pl's Mem. at 16.  And Carver argues that

"there are no documents indicating that [Mr. Cedillo] ever ceased being the President of 656 Myrtle [Avenue]." *Id.*

Mr. Cedillo responds that any misstatements were inadvertent, not deliberate. And he asserts that, taken as a whole, his bankruptcy Schedules and Statements give an accurate portrait of his financial situation. Mr. Cedillo admits that his Statement of Financial Affairs "does not indicate that [he] was a shareholder of the Hardware Store." Cedillo Decl. ¶ 51(a). But Mr. Cedillo argues that he listed K&R Plumbing "by mistake" in response to Question 18 of his Amended Statement of Financial Affairs. Answer ¶ 29. Mr. Cedillo also "inadvertently omitted" a security interest in his schedules, but asserts he did not believe he had an enforceable security interest. Answer ¶ 28; Cedillo Decl. ¶ 51(c). Mr. Cedillo also does not dispute that he values the amounts due and owing from NY Electric to him at $1.00. But he explains that he did so because he understood that any payments on this note would be made to New York State, not to him. Cedillo Decl. ¶ 51(c).

 Mr. Cedillo also does not dispute that he did not disclose the funds received into his bank accounts in 2011. Mr. Cedillo argues that he "does not know the nature of the funds, or whether they should have been listed in his schedules," and "did not possess his 2011 bank statements when the petition was filed" in order to determine whether or not the funds should have been listed. Def's Counterstmt. ¶¶ 53, 55.

Finally, Mr. Cedillo does not dispute that he did not disclose that he was formerly the nominal owner and an officer of 656 Myrtle Avenue. But he argues that the corporation belongs to his sister, not to him. Specifically, Mr. Cedillo argues that "after the failure of the nightclub, [his] sister no longer trusted [his] business judgment and did not authorize [him] to act on behalf

of the corporation," and therefore, when completing his Schedules and Statements, he did not list

an ownership interest in the corporation.  Cedillo Decl. ¶ 51(b).

Here, the record shows that Mr. Cedillo made false statements in connection with his

bankruptcy case.  These include:

- Mr. Cedillo did not disclose his interest in K&R Hardware in response to Question 18 of his Amended Statement of Financial Affairs and on his Schedule B as an asset of his estate.

- Mr. Cedillo valued the note from NY Electric under the security agreement as $1.00, and did not list the security interest in the Hardware Store Assets in his Schedule B as an asset of his estate.

- Mr. Cedillo did not disclose that in 2011, he received deposits into his bank account totaling $22,102.87 in response to Questions 1 and 2 of his Amended Statement of Financial Affairs.

- Mr. Cedillo did not disclose his interest in 656 Myrtle Avenue Realty Corp. on his Schedules and Statements.

For these reasons, and based on the entire record, Carver has established that there is no

genuine dispute as to a material fact with respect to the second element of its Section

724(a)(4)(A) claim, that Mr. Cedillo made false statements under oath in connection with his

bankruptcy case.

*Whether Carver Has Established that Mr. Cedillo Knew the Statements Were False*

The third element that Carver must establish is that Mr. Cedillo knew that the statements

that he made under oath in connection with his bankruptcy case were false.  That is, Carver must

show that there is no genuine dispute as to a material fact that Mr. Cedillo knew that the

statements in his bankruptcy Schedules and Statements were false at the time that they were

made.

"'A statement is considered to have been made with knowledge of its falsity if it was

known by the debtor to be false, made without belief in its truth, or made with reckless disregard

for the truth.'" *U.S. Trustee v. Manno-DeGraw (In re Manno-DeGraw)*, 2016 WL 3708062, at

*2 (Bankr. E.D.N.Y. July 6, 2016) (quoting *Montey Corp. v. Maletta (In re Maletta)*, 159 B.R.

108, 112 (Bankr. D. Conn. 1993)).  '"Courts may consider the debtor's education, business

experience, and reliance on counsel when evaluating the debtor's knowledge of a false

statement.'" *Bub v. Rockstone Capital, LLC*, 516 B.R. 685, 695 (E.D.N.Y. 2014) (quoting *In re

Maletta*, 159 B.R. at 112)).  At the same time, "[a] debtor cannot, merely by playing ostrich and

burying his head deeply enough in the sand, disclaim all responsibility for statements which he

has made under oath." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir. 1987).  "Once

the objecting creditor meets its burden of proof and has produced persuasive evidence of a false

statement, the burden shifts to the debtor to come forward with evidence to prove that it was not

an intentional misrepresentation or provide some other credible explanation." *Micro

Connections, Inc. v. Shah (In re Shah)*, 388 B.R. 23, 37 (Bankr. E.D.N.Y. 2008).

Carver argues that Mr. Cedillo "was aware that he owned the Hardware Store within the

six (6) years preceding the [Petition] Date" and that he "was still operating the Hardware Store

after he filed his bankruptcy petition."  Pl's Mem. at 18-19.  And Carver argues that Mr. Cedillo

was aware that he "transferred the Hardware Store to his wife's company less than one (1) year

before the Petition Date . . . ."  Pl's Mem. at 18.

Carver also argues that Mr. Cedillo "certainly had knowledge of his interest in 656

Myrtle [Avenue], yet he still failed to disclose it in his Petition."  Pl's Mem. at 19.  Specifically,

Carver argues that Mr. Cedillo "formed 656 Myrtle [Avenue] in 2004 and was its owner,

president and sole shareholder and, according to [Mr. Cedillo], there are no documents indicating

that anyone other than [himself] owns the 656 Myrtle [Avenue]."  *Id.*  And Carver argues that

when questioned about 656 Myrtle Avenue selling its real property, Mr. Cedillo admitted to

selling it.  In other words, Carver argues that Mr. Cedillo "was clearly aware that 656 Myrtle [Avenue] sold its real property after the [Petition] Date, yet he failed to inform the Trustee or his creditors and simply sat idly by while valuable property of his estate was liquidated without anyone's knowledge."  Pl's Mem. at 19.

Mr. Cedillo responds that "the level of cooperation and disclosure of information provided by him, coupled with his ignorance and limitations, demonstrate that the inadvertent errors and omissions in the schedules do not rise to the level of either materiality or a false oath under the circumstances of this case."  Opp. at 21-22.  That is, Mr. Cedillo argues that he believed the disclosures in his Schedules and Statements were both accurate and adequate at the time they were made.

Mr. Cedillo also responds that he made "no attempt to hide [his] interest in the Hardware Store or the transfer."  Cedillo Decl. ¶ 51(a).  Specifically, Mr. Cedillo argues, in substance, that because he listed the transfer of the Hardware Store Assets to NY Electric in response to Question 10 of his Amended Statement of Financial Affairs, together with listing the Note due from NY Electric as additional consideration in his Schedule B, this was sufficient to disclose his ownership interest in K&R Hardware.  In addition, Mr. Cedillo argues that "he provided Web [Holdings], Carver, and the Chapter 7 Trustee with an appraisal of K&R Hardware's assets, and fully disclosed his prior interest in K&R Hardware" in an effort to provide full disclosure.  Def's Counterstmt. ¶ 50.  And Mr. Cedillo states that he "spent thousands of dollars" on appraisals, including an appraisal of "the assets of NY Electric and [K&R Plumbing], again in an effort to "provide full disclosure."  Cedillo Decl. ¶¶ 51(a), 48.

Mr. Cedillo also responds that he believed that the disclosure of the security interest provided in his Schedule B "fully described" the security interest granted to him by NY Electric

in connection with the transfer of the Hardware Store Assets.  Cedillo Decl. ¶ 51(c).  Mr. Cedillo

states that "[a]lthough the term 'security interest' was not utilized as part of the description, the

obligation due from N.Y. Electric was disclosed on Schedule B."  Def's Counterstmt. ¶ 49.  And

he argues that "since the agreement with NY Electric was that any moneys paid by the

corporation would be paid to NYS," he did not expect to receive any of the payments, and as

such, valued the security interest as $1.00.  Cedillo Decl. ¶ 51(c).

     In addition, here too Mr. Cedillo argues that he had NY Electric's assets appraised, and

"[s]ince the secured obligations due to the N.Y.S. Department of Taxation greatly exceeded the

value of the assets, and predated the security interest, any claim against N.Y. Electric is

unsecured," and that is also why the security interest is valued at $1.00.  Def's Counterstmt. ¶ 49.

Mr. Cedillo argues that because he thought the description was sufficient, he "inadvertently

omitted the security interest from NY Electric when [he] listed the note on [his] Schedule B."

Cedillo Decl. ¶ 51(c).

     Further, Mr. Cedillo responds that although he did not disclose the deposits received into

his account in 2011, he "does not know the nature of the funds, or whether they should have been

listed in his schedules."  Def's Counterstmt. ¶¶ 53, 55.  Mr. Cedillo also argues that he "lost all

of his financial records in Hurricane Sandy, and did not possess bank statements when his

petition was filed," and that when he "received the 500 pages of bank statements with this

information in 2014, [he] did not see these deposits."  Def's Counterstmt. ¶¶ 53, 55; Cedillo

Decl. ¶ 51(d).  That is, Mr. Cedillo argues that he "did not intentionally omit this information

from [his] Schedules and Statements."  Cedillo Decl. ¶ 51(d).

     And finally, Mr. Cedillo responds that since 2006, and at the time he completed his

Schedules and Statements, he did not believe that he was an officer, shareholder, or had any

interest in 656 Myrtle Avenue, and therefore did not list any information about the corporation on his Schedules and Statements. Specifically, Mr. Cedillo argues that 656 Myrtle Avenue belonged to his sister, and that after the nightclub's failure, his sister "no longer trusted [his] business judgment and did not authorize [him] to act on behalf of this corporation." Cedillo Decl. ¶ 51(b). That is, when Mr. Cedillo completed his Schedules and Statements, he "did not consider [himself] an owner or officer [or shareholder] of this entity, and did not realize that [he] could be considered an officer of this corporation." *Id.*

Here, the record shows, and Mr. Cedillo acknowledges, that he made false statements in connection with his bankruptcy case. But the record also shows that Mr. Cedillo provides several plausible alternative explanations with respect to those false statements.

First, as to some of these statements, Mr. Cedillo states, in substance, that at the time he made the false statements, he believed that other disclosures in his bankruptcy Schedules and Statements sufficiently disclosed his interests. Specifically, Mr. Cedillo believes that he accurately and adequately described his interest in K&R Hardware by disclosing the transfer of the Hardware Store Assets, describing the note, and providing his creditors with an appraisal of those assets. And he believed that he adequately described the security interest, and valued the note at only $1.00, because he expected repayment to be made directly to New York State.

Second, as to others of the statements, Mr. Cedillo states, in substance, that any false statements made by him were inadvertent, not knowing, and simply the product of mistake. Specifically, at the time Mr. Cedillo completed his Schedules and Statements, he did not know whether the deposits in his account constituted income, and that upon further review of his 2011 bank statements, he did not see any deposits listed. And at the time he completed his Schedules

and Statements, Mr. Cedillo states that he believed that he was not an officer, shareholder, or had any interest in 656 Myrtle Avenue.

For these reasons, Carver has not established that there is no genuine dispute as to a material fact as to the third element of its Section 724(a)(4)(A) claim, that Mr. Cedillo knew that the statements that he made under oath in connection with his bankruptcy case were false.

### *Whether Carver Has Established that Mr. Cedillo Made the Statements with Fraudulent Intent*

The fourth element that Carver must establish is that Mr. Cedillo made the false statements with fraudulent intent. Carver argues that Mr. Cedillo fraudulently made false oaths and accounts in connection with his bankruptcy case. Specifically, Carver points to the false statements described above in Mr. Cedillo's Schedules and Statements, and argues that these false statements point to the conclusion that Mr. Cedillo misrepresented or omitted these matters for the purpose of perpetrating a fraud.

Mr. Cedillo responds, in substance, that Carver has not come forward with evidence sufficient to meet the standard necessary to establish fraudulent intent. Just as he denies that he acted knowingly, he argues that "to the best of [his] abilities, [he] believed the petition and schedules [he] submitted were accurate and the omissions were not made with any intent to hide information from [his] creditors or the Court." Cedillo Decl. ¶ 52.

As stated above, the barrier to establishing the absence of a genuine dispute of material fact with respect to fraudulent intent is high. "Fraudulent intent must be shown by actual, not constructive fraud," and the plaintiff must demonstrate that "the information was omitted for the specific purpose of perpetrating a fraud and not simply because the debtor was careless." *In re Dubrowsky*, 244 B.R. at 571-72.

Here, as noted above, the record shows, and Mr. Cedillo acknowledges, that he made false statements in connection with his bankruptcy case.  As also described above, the record also shows that he provides plausible alternative explanations with respect to those false statements.  As to some, he states that his bankruptcy Schedules and Statements, taken as a whole, sufficiently disclosed his interests.  And as to others, he states that any false statements were inadvertent, not knowing, and were caused by mistakes, misunderstandings, or incomplete information, and not by an intent to defraud.

The record also shows that Carver has not identified persuasive evidence of fraudulent intent by Mr. Cedillo.  While it has identified several errors in Mr. Cedillo's Schedules and Statements, Carver has not demonstrated the kind of circumstances that signal a knowing and fraudulent plot or scheme to conceal information from creditors, or to use the bankruptcy process to commit a fraud.

For these reasons, Carver has not established that there is no genuine dispute as to a material fact as to the fourth element of its Section 727(a)(4)(A) claim, that Mr. Cedillo made the false statements in connection with his bankruptcy case with fraudulent intent.

*Whether Carver Has Established that the Statements Related Materially to Mr. Cedillo's Bankruptcy Case*

The fifth element that Carver must establish is that the statements at issue related materially to Mr. Cedillo's bankruptcy case.  That is, Carver must show that there is no genuine dispute as to a material fact that the false statements that Mr. Cedillo made under oath related materially to his bankruptcy case.

Carver argues that each of the above-described statements or omissions is materially related to Mr. Cedillo's bankruptcy case.

Mr. Cedillo responds that "the level of cooperation and disclosure of information provided by him, coupled with his ignorance and limitations, demonstrate that the inadvertent errors and omissions in the schedules do not rise to the level of . . . materiality . . . under the circumstances of this case." Def's Mem. at 17.  Specifically, Mr. Cedillo argues that there is "clearly a material question of fact" with respect to whether he was a shareholder of 656 Myrtle Avenue Realty Corp. at the time that his bankruptcy petition was filed.  Def's Mem. at 16.  That is, Mr. Cedillo argues that because he did not believe that he held an interest in that entity at the time that he filed his bankruptcy case, his failure to list it on his Schedules and Statements does not relate materially to his bankruptcy case.

Here, as noted above, the record shows, and Mr. Cedillo acknowledges, that he made false statements in connection with his bankruptcy case.  The record also shows that these false statements are material because they bear "a relationship to the debtor's business transactions or estate [and] . . . would lead to the discovery of [Mr. Cedillo's] assets, business dealings or existence or disposition of property." *In re Murray*, 249 B.R. at 288 (quoting *In re Sawyer*, 130 B.R. at 394).  And while the parties disagree as to whether Mr. Cedillo was a shareholder of 656 Myrtle Avenue at the time that his bankruptcy petition was filed, the decision to omit the corporation from his Schedules and Statements and 'the determination of relevance and importance of the question is not for [him] to make.'" *In re Handel*, 266 B.R. at 590 (quoting *In re Diodati*, 9 B.R. at 808).

For these reasons, Carver has established that there is no genuine dispute as to a material fact as to the fifth element of its Section 727(a)(4)(A) claim, that Mr. Cedillo made false statements that related materially to his bankruptcy case.

*         *         *

In sum, Carver has shown that there is no genuine dispute as to a material fact as to the first element of its Fourth Claim for Relief, to deny Mr. Cedillo a discharge pursuant to Bankruptcy Code Section 727(a)(4)(A), that he made statements under oath in connection with his bankruptcy case, the second element of this claim, that several of these statements were false, and the fifth element of this claim, that these false statements related materially to his bankruptcy case. But Carver has not shown that there is no genuine dispute as to the third and fourth elements of this claim, that Mr. Cedillo knew that these statements were false and that he made the false statements with fraudulent intent. For these reasons, and based on the entire record, Carver's Motion for Summary Judgment on the Fourth Claim is denied.

## Conclusion

Carver has shown that there is no genuine dispute as to a material fact as to the first, second, third, and fourth elements of its First Claim for Relief, determining that the debt owed to Carver is nondischargeable pursuant to Bankruptcy Code Section 523(a)(2)(B), that Mr. Cedillo submitted a statement in writing, that the statement was materially false, that the statement concerned his financial condition, and that Carver relied on the statement in deciding whether to make the Loans to the Corporations. But Carver has not shown that there is no genuine dispute as to the fifth element of this claim, that Mr. Cedillo submitted the PFS with the intent to deceive Carver. For these reasons, Carver's Motion for Summary Judgment on the First Claim for Relief is denied.

In addition, Carver has shown that there is no genuine dispute as to a material fact as to the first, second, and third elements of its Second Claim for Relief, to deny Mr. Cedillo a discharge pursuant to Bankruptcy Code Section 727(a)(2)(A), that Mr. Cedillo transferred the Hardware Store Assets, that the transfer of the Hardware Store Assets was a transfer of an

interest of Mr. Cedillo in property, and that the transfer of the Hardware Store Assets occurred within one year of the Petition Date.  But Carver has not shown that there is no genuine dispute as to the third element of this claim, that Mr. Cedillo transferred the Hardware Store Assets with intent to hinder, delay, or defraud his creditors.  For these reasons, Carver's Motion for Summary Judgment on the Second Claim for Relief is denied.

Carver has also shown that there is no genuine dispute as to a material fact as to the first, second, and fifth elements of its Fourth Claim for Relief, to deny Mr. Cedillo a discharge pursuant to Bankruptcy Code Section 727(a)(4)(A), that Mr. Cedillo made statements under oath, that several of these statements were false, and that these false statements related materially to his bankruptcy case.  But Carver has not shown that there is no genuine dispute as to the third and fourth elements of this claim, that Mr. Cedillo knew that these statements were false and that Mr. Cedillo made the statements with fraudulent intent.  For these reasons, Carver's Motion for Summary Judgment on the Fourth Claim is denied.

For the reasons stated herein, and based on the entire record, Carver's Motion for Partial Summary Judgment is denied.  An order in conformity with this Memorandum Decision shall be entered simultaneously herewith.

**Dated: Brooklyn, New York**
        **September 11, 2017**

                                        **Elizabeth S. Stong**
                                        **United States Bankruptcy Judge**